**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Howard JONAS, Lewis Jonas, Anthony Lewis Guarino, and Howard Mark Mandel, Defendants-Appellants.**

No. 84–5735.

United States Court of Appeals,
Eleventh Circuit.

April 14, 1986.

Bierman, Sonnett, Shohat & Sale, P.A., Jon A. Sale, Benedict Kuehne, Miami, Fla., for Jonas & Jonas.

Charles G. White, Miami, Fla., for A. Guarino.

Timothy W. Harrington, Stephen H. Broudy, Ft. Lauderdale, Fla., for Mandel.

Norman Moscowitz, Jon May, Nancy L. Worthington, Leon B. Kellner, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Before GODBOLD, Chief Judge, FAY, Circuit Judge, and PECK *, Senior Circuit Judge.

PECK, Senior Circuit Judge:

Appellants are four of five defendants named in a ten count indictment charging a series of fraudulent acts. The fifth defendant, Walter Woodby, pled guilty and testified at trial for the government. The specific charges included engaging in a scheme to defraud by mail in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, transportation of property obtained by fraud in violation of 18 U.S.C. § 2314, and mail fraud in violation of 18 U.S.C. § 1341. At the conclusion of a protracted trial, the jury returned verdicts finding all defendants guilty as charged. Committed sentences followed by period of probation were imposed as to each of the four.

## I

Evidence offered by the government established that appellants Howard and Lewis Jonas, who are brothers, formerly worked as salesmen for First Federal Bullion in New York City. First Federal Bullion was what has come to be known as a "boiler-room operation" in which salesmen used hard sell, high-pressure tactics to obtain investments in precious metals which the company neither possessed nor purchased. In March of that year Howard Jonas reported to the Federal Bureau of Investigation that the company by which he and his brother were employed was engaged in illegal operations, but the government states that "[b]ecause of limited prosecutorial and investigative resources, First Federal Bullion was never prosecuted." It subsequently ceased operations and the Jonases moved to Florida.

During the same period of time, Walter Woodby and the Jonases worked as salesmen for First Federal Bullion, and in 1980 Woodby was arrested for a burglary that the brothers helped plan. They provided bail, and following his conviction they appeared at the sentencing procedure, offering a job in the event of probation. They paid for his transportation to Florida and the three discussed various businesses which they could enter. They decided on an operation similar to that of First Federal Bullion and formed an enterprise named Conti Associates, Inc., of which Woodby was president, vice president and secretary and the Jonases would be the financiers.

The Jonases, representing Conti Associates, leased space in a Ft. Lauderdale, Florida building, stating that the office would be headquarters for a toy manufacturing company. The name "Conti" was chosen because of its similarity to a very large precious metals company in New York. Woodby signed the corporation papers and opened the company's checking account, but because circumstances aroused its suspicions, the bank closed the account a month later. A second account was opened and closed, and a third account was subsequently opened. Woodby signed checks drawn on this account, but Howard Jonas kept the checkbook and usually made out the checks.

In due course, Melvin Rosoff and appellants Guarino and Mandel, who had worked together in another office, became employees of Conti and all three of them worked as salesmen, primarily selling tantalum, titanium and silver by telephone. During the summer of 1981 ten individuals invested a total of $52,630 with Conti Associates as a result of these solicitations, although Conti neither purchased nor delivered the metals ordered, nor did it return the investors' money.

Rosoff testified that when he began working at Conti, the company had three or four telephones, but that additional lines

* Honorable John W. Peck U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

were subsequently installed. He worked with Guarino, Mandel and Woodby, whom Rosoff, testifying under a grant of immunity, described as a "front" in case anything went wrong. It always appeared to Rosoff that the business belonged to the Jonas brothers. He further testified that he got both names and his "sales pitch" from Guarino and Mandel, and he detailed the technique of making sales. When Rosoff had done all he could to convince a customer to buy, he would turn the telephone over to Guarino or Mandel, experts at closing a deal. The ten purchasers of interests in non-existent metals referred to above all testified to the conversations leading to their investments, and with minor variations the techniques used by the salesmen were identical.

During the FBI investigation of this matter, Howard Jonas gave a statement which was received in evidence at trial. In that statement he alleged that he and his brother has formed Conti Associates for the purpose of manufacturing and selling toys, but that that enterprise failed due to their lack of experience in the area. He further alleged that at that time they became acquainted with Guarino and Mandel and that the transformation of the enterprise then occurred with the later two being the principals while he and his brother Lewis simply did their bidding. However, no further evidence concerning a toy business was offered, and since appellants do not challenge the sufficiency of the evidence on which their convictions were based there is no occasion to further examine that contention here.

## II.

■ All four of the appellants assign as error the district court's denial of their respective motions for severance.

In support of this assignment of error they again contend that the Jonas brothers defended on the theory that Guarino and Mandel, along with Walter Woodby, "ran a sophisticated investment scheme, with the Jonases acting 'as mere gofers'", while Guarino and Mandel presented "a different defensive posture," representing themselves to have been innocent salesmen working for the Jonases. All argue that the defenses are antagonistic, irreconcilable and mutually exclusive, citing *United States v. Carter*, 760 F.2d 1568 (11th Cir. 1985). They submit that the jury in order to believe the core of the defense offered on behalf of one defendant would necessarily have to disbelieve the defense offered by a co-defendant, so that severance was mandatory pursuant to *United States v. Stephenson*, 708 F.2d 580, 582 (11th Cir. 1982). While recognizing their burden in establishing an abuse of discretion on the part of the trial judge in this regard, *United States v. Pirolli*, 742 F.2d 1382, 1386 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); Fed. R.Crim.P. 14, they argue that the irreconcilability of the defenses caused the court's action to amount to such abuse. The trouble with that contention, however, is simply that it is not supported by the record. None of the defendants testified on his own behalf, so this case markedly differs from those in which co-defendants take the stand and directly blame one another. *See Stephenson*, 708 F.2d at 580; *United States v. Berkowitz*, 662 F.2d 1127 (5th Cir. Unit B 1981). As previously noted, the only indication in the evidence supporting the allegation that the Jonases had intended to go in the toy business was contained in the Howard Jonas statement received in evidence and in testimony relative to the renting of the offices, and at the very best the other contentions essential to the asserted defense may be discernible from inferences to be gleaned from the cross-examinations of government witnesses. One of the appellant's briefs observes that the situation presented "was more than the classic finger pointing by defendants scenario." However, on the basis of the record the "scenario" cannot even be said to rise to that level. In short, the appellants have failed to prove that they suffered the specific and compelling prejudice, which is necessary to finding an abuse of the district court's discretion. *Carter*, 760 F.2d at 1574–75. We add that considering the evidence in the light most favorable to the government, as we must in the present posture of the case, we conclude that the

record demonstrates a sophisticated scheme of merchandising non-existent metals on the basis of telephone solicitation by an organization created and operated by the defendants acting in concert.

## III.

■ *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) established the principle that where there is a substantial risk that the trier of fact will look to incriminating extra-judicial statements of one co-defendant in determining the guilt of another co-defendant, the admission of the former's confession in a joint trial violates the latter's right to confront the witnesses against him. *United States v. Garrett,* 727 F.2d 1003, 1013 (11th Cir.1984), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985).

In the present case, both Jonases and Guarino assign as error the receipt in evidence of statements made by Howard Jonas and Guarino to the FBI, arguing that such receipt violated their right to confrontation under the Sixth Amendment. They argue that the government's attempt to redact these statements was ineffective and that the jury must have known that the "other people" mentioned in Howard Jonas' statement included Guarino and Mandel and that the "other people" mentioned in the Guarino statement included the Jonas brothers. However, the statements received in evidence were unsuccessful efforts by Howard Jonas and Guarino respectively to exculpate themselves and no reasonable reading of the redacted statements could be considered to inculpate the others. In *Garrett,* 727 F.2d at 1013, we stated that "in order to invoke the *Bruton* doctrine, the confession in question must directly, rather than indirectly, implicate the complaining defendant." The statements here under consideration neither directly nor indirectly implicate "the complaining [appellant]," and no error is perceived in their receipt in evidence.

## IV.

■ Guarino contends on appeal that the statement made by him to the FBI was received in evidence in violation of his Fifth Amendment rights as defined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The evidence establishes that Guarino learned indirectly that an FBI agent had attempted to contact him, and that he thereupon telephoned that agent. The agent stated that she wanted to talk with him in connection with an investigation of Conti Associates. He agreed to talk with the FBI and appeared voluntarily at its offices. An agent testified that Guarino was not at any time under restraint and that at all times he was free to terminate the interview.

Guarino contends that in spite of the circumstances the district court failed to follow an objective, "reasonable man" standard in deciding whether a suspect was "in custody" when the statement was made. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 3152, 82 L.Ed.2d 317 (1984) the Court stated "The only relevant inquiry is how a reasonable man in the suspect's position would have understood his position." In view of Guarino's voluntary appearance at the FBI office and the circumstances prevalent at the interview it must be concluded that a reasonable man in his position would not have considered himself in custody, and we conclude that no violation of his *Miranda* rights has been established.

## V.

■ The remaining contention raised by the appellants concerns a situation which involved a member of the jury. On the morning of the sixth day of trial as the mid-point in trial was being reached, this juror stated to the court at a side bar conference, "On the break I was thinking about it, and I came to the conclusion that I have pretty well made up my mind about it." The district judge immediately stated, "Do not tell us anything." The juror responded, "No, no, but I just wondered if it was okay for me to continue on that basis." In the colloquy that followed the judge observed that he suspected "that a lot of people have arrived at conclusions." After a further discussion, the court said, "I am going to ask you to do your very best to

keep an open mind until you have heard everything. All right?", to which the juror responded "Yes, Sir."

The following day the court reopened the matter and again received an affirmative response to a further inquiry as to whether the juror would and could keep his mind open until, in effect, the case was submitted to the jury.

In a case in which a juror allegedly said on the second day of a four day trial, "As far as I'm concerned, [from] what I have already heard he's guilty," the judge allowed that juror to remain without even an interrogation. This determination was held to be within the court's discretion. The reviewing court went on to say, "A juror's statement that '[from] what I have heard already he's guilty' at the conclusion of the prosecutor's case and before the defendant presents any evidence does not reflect serious prejudice, but only an objective evaluation of the evidence presented to date in trial." *Grooms v. Wainwright*, 610 F.2d 344, 346, 348 (5th Cir.), *cert. denied* 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980), *cited with approval United States v. Williams*, 716 F.2d 864, 865 (11th Cir. 1983).

After receiving the assurance of the juror that he would keep an open mind, the trial court in the present case stated to counsel, "This juror obviously has taken what we have said very seriously, and he had some feelings that he wanted to communicate to all of us.... I would say it was a commendable display of honesty."

The determination as to whether or not a juror should be relieved in such circumstances is peculiarly within the discretion of the trial court, *Grooms*, 610 F.2d at 347, and we observe no abuse of that discretion in the established circumstances.

### VI.

We are not unmindful of the government's contention that the harmless error rule applies to each of the contentions of the appellants except the last, on the grounds that no prejudice is shown to have resulted from any error which may have occurred. *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980). While we are not in disagreement with that contention, it need not be explored herein in view of our conclusion that the district judge committed no such error. It nevertheless seems appropriate to observe that in the course of a twelve day trial the government through thirty-two witnesses and a large number of exhibits constructed an overwhelming case to which defendants provided scant response through their two witnesses.

Accordingly, the judgments of conviction are AFFIRMED.