**UNITED STATES of America,**
**Plaintiff-Appellant,**

**v.**

**George A. PHILLIPS, and Luke A.**
**Finkelstein, Defendants-Appellees.**

**No. 86-7272.**

United States Court of Appeals,
Eleventh Circuit.

March 20, 1987.

John C. Bell, U.S. Atty., Mongtogmery, Ala., Gloria Phares, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Joel H. Pearson, Whitesell, Morrow & Romine, P.C., Calvin M. Whitesell, Montgomery, Ala., David Cromwell Johnson, Johnson, Cory & McNamee, Birmingham, Ala., for defendants-appellees.

Before FAY and JOHNSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

In this case we review the district court's order granting the suppression of statements made by appellees to police officers and to agents of the Bureau of Alcohol, Tobacco, and Firearms (hereinafter Bureau). The district court found that appellees were in custody within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) at the time the statements were made and that appellees were not given their *Miranda* rights. The United States appeals from the district court's order. Because we find that appellees were not in custody for the purposes of *Miranda* at the time the statements were made, we reverse the district court's order granting the motion to suppress.

## FACTUAL BACKGROUND

Appellees Luke Finkelstein and George Phillips are engaged in the business of selling firearms at the Capital Pawn Shop, Inc., (hereinafter the Shop) Montgomery, Alabama, which is licensed by the Bureau. On March 4, 1985, Terry Bracken and Billy Joe Pearson, North Carolina residents, came to the Shop to purchase a .45 caliber semi-automatic pistol. Finkelstein initially refused to sell the gun when he discovered, by examining their driver's licenses, that Bracken and Pearson were out-of-state residents. At this time, however, Phillips, who also operates a tavern next door, came into the Shop, and upon being apprised of the situation, offered to buy the gun on paper. Finkelstein then prepared a Bureau Form 4473 Firearms Transaction Record, which listed Phillips as the purchaser of the gun, and recorded the sale in the Shop's Acquisition and Disposition Record book. Phillips, in turn, gave the gun to Pearson and Bracken, who paid Finkelstein $200.00. The Bureau calls this type of transaction a "straw man" sale. Subsequently, the gun was used by Pearson in an armed robbery and murder in North Carolina on March 26, 1985.[1]

On April 23, 1985, E.T. Hill, a North Carolina detective investigating the Pearson murder, contacted Montgomery police Officer Corporal Dan Carmichael, who was assigned to all the pawn shops in the Mont-

---

1. This case does not concern the March 26, 1985 robbery and murder committed in North Carolina other than as background information. This opinion is concerned solely with a review of the district court's ruling that the appellees were in custody for *Miranda* purposes at the time their statements were given to police officials.

gomery area. On April 24, 1985, Detective Hill, Officer Carmichael, and Terry Bracken, who had purchased the gun earlier with Billy Pearson, went to the Shop. Bracken, wearing a body wire, attempted to purchase a second gun from Finkelstein. Knowing that selling a gun to a non-resident was "wrong", Finkelstein refused to sell a second gun to Bracken. Officer Carmichael at this time asked Finkelstein to accompany the officers to the police station. Finkelstein agreed and the three drove to the station.[2] Officer Carmichael also took possession of Finkelstein's Firearm Transaction Record, Form 4473, which listed Phillips as the purchaser of the gun.

Officer Carmichael testified that when he asked Finkelstein to come to the police station, he intended to obtain a statement from Finkelstein. It is undisputed that Finkelstein knew Officer Carmichael well and that they saw each other every day since Officer Carmichael was assigned to pawn shop detail. At the police station, Finkelstein was first taken to a large holding room and then transferred to a smaller office. Only Officer Carmichael and Detective Hill were present. Officer Carmichael testified that at this point he advised Finkelstein of his *Miranda* rights by way of the police department's *Miranda* rights form. Finkelstein testified that he was not given his *Miranda* rights and denied ever signing a *Miranda* rights form. Officer Carmichael testified that the rights form was delivered to the Bureau. The record does not contain the *Miranda* rights form allegedly given to Finkelstein. The district court found that, "insofar as the record shows," appellees did not receive their *Miranda* rights.

It is undisputed that Finkelstein was not placed under arrest, nor was he handcuffed or locked into the small office at the police station. While neither Officer Carmichael nor Detective Hill informed Finkelstein that he was free to leave, Officer Carmichael testified that Finkelstein could have left the police station at any time.

Finkelstein became apprehensive when the officers began asking questions. At this point, Detective Hill told Finkelstein that he was not interested in Finkelstein's conduct. Detective Hill stated that he was just investigating the North Carolina murder, and that Finkelstein's cooperation would be helpful. Officer Carmichael reinforced Detective Hill's position. Finkelstein then cooperated with the officers and gave a statement in which he described the straw man transaction involving Pearson, Bracken and appellee Phillips.

Finkelstein testified at the suppression hearing that he did not feel he was free to walk away from Officers Carmichael and Hill at either the Shop or the police station. He also testified, however, that the officers did nothing to prevent him from leaving the police station. It is also clear that at all times while Finkelstein was in the presence of the officers, either at the Shop or the police station, he never requested a lawyer nor made any attempt to terminate the interview.

On April 24, 1985, Officer Carmichael left word at the Shop asking Phillips to come to City Hall.[3] Phillips agreed to the meeting and drove himself to City Hall where he spoke with Officer Carmichael regarding the straw man transaction. It is undisputed that Officer Carmichael did not arrest or restrain Phillips in any way. It is also clear that Officer Carmichael did not inform Phillips of his *Miranda* rights. When Officer Carmichael asked Phillips about the straw man transaction, Phillips replied, "[w]hatever Luke [Finkelstein]

---

**2.** The record is unclear as to how appellee Finkelstein traveled to the police station. Officer Carmichael could not recall how Finkelstein was driven to the police station, but testified that he and Detective Hill traveled together in one vehicle. Appellee Finkelstein, on the other hand, testified that Detective Hill drove him to the station and that Officer Carmichael rode in a separate vehicle. Detective Hill was not present to testify at the suppression hearing. The record does not contain any documents or materials accumulated or generated by Detective Hill's involvement in this case.

**3.** The record of the suppression hearing is somewhat confusing in that appellee Phillips testified that he was asked by Officer Carmichael to come to City Hall (Record at 80) whereas Officer Carmichael testified that Phillips was asked to come to the police station. (Record at 27).

says is what happened." This brief conversation between Phillips and Officer Carmichael was not reduced to a written statement.

On April 25, 1985, the day after Officer Carmichael and Detective Hill met with appellees, Officer Carmichael called the Bureau's Compliance Operations office in Birmingham and left a message that he had spoken with appellees and that they had admitted making the straw man transaction. Roger Bowling, the head of supervision for the Bureau in Birmingham, assigned Kris Fleishman, an inspector and compliance officer, to conduct a compliance inspection of the Shop. As an inspector-compliance officer for the Bureau, Fleishman commonly conducted inspections of alcohol, tobacco, and firearms industries coming under federal regulation. Pawn shops, being licensed for firearms, are governed by federal regulations and thus come under the supervision of the Bureau. Finkelstein testified that he had previously met Fleishman prior to going into the pawn shop business when Fleishman came to Finkelstein's house to explain the administrative procedures required by the Bureau for a federal firearms license.

On May 7, 1985, Fleishman visited the Shop and spoke with Finkelstein. Fleishman testified that during the course of his visit he explained to Finkelstein that the law enforcement division of the Bureau was aware of the straw man transaction and that the Bureau would possibly conduct an investigation of the matter. Fleishman did not arrest appellee Finkelstein nor did he restrain his movement in any way. He did not advise Finkelstein of his *Miranda* rights. The record is clear that Fleishman made no promises to Finkelstein with respect to any future action the Bureau's law enforcement division might take in exchange for Finkelstein's cooperation.[4] Fleishman checked Finkelstein's inventory and paperwork, which included the Form 4473 Firearms Transaction Record and Finkelstein's false entry in the Master Log of firearms transactions which showed

Phillips as the purchaser of the gun. While at the Shop, Finkelstein gave Fleishman a statement in which Finkelstein described the straw man transaction.

A copy of the April 24, 1985, statement obtained by Officer Carmichael and the May 7, 1985, statement obtained by Fleishman were sent to Bureau criminal enforcement agents, Lester Martz and Glen Kibler, who on June 13, 1985, visited the Shop. The purpose of the visit was to obtain statements from Finkelstein and Phillips regarding the firearms transaction. Martz and Kibler, who identified themselves to appellees as Bureau criminal enforcement agents, explicitly informed appellees that they were not under arrest. The agents did not advise appellees of their *Miranda* rights nor did they restrain appellees in any way. Both Finkelstein and Phillips were present at the Shop when the Bureau agents arrived and voluntarily discussed the sale of the handgun. Thereafter, Agent Martz and Kibler interviewed both appellees at the Shop. Both appellees gave oral statements describing the circumstances surrounding the sale.

The agents then left Finkelstein at the Shop and returned to their office where Agent Kibler reduced the oral statements given by appellees to writing. Agent Kibler testified that Finkelstein remained at the Shop so that appellees would not be forced to close their business. The agents had requested that Phillips sign his statement at Agent Kibler's office after it was reduced to writing. Phillips had agreed and followed the agents in his own car to their office where he signed his statement. The agents then returned to the Shop where Finkelstein signed his statement.

Thereafter on January 7, 1986, a two count indictment was issued out of the Middle District of Alabama charging both Finkelstein and Phillips with knowingly selling a firearm to a nonresident of Alabama, in violation of 18 U.S.C. § 922(b)(3) (1982) and knowingly making a false entry

---

**4.** The record in fact reflects that compliance inspector Fleishman did not investigate criminal offenses and that under the Bureau's depart-

mentalization he was without the authority to speak on behalf of the Bureau's law enforcement division.

in a record they were required by law to maintain, in violation of 18 U.S.C. § 922(m).

Appellees on March 11, 1986, moved under the Fourth, Sixth and Fourteenth Amendments to suppress all statements made to Officer Carmichael of the Montgomery police department and to all Bureau agents. Appellees' motion to suppress was based on the grounds that when the statement were given appellees were in custody and had not been informed of their rights pursuant to *Miranda.* The district court on March 19, 1986, held a hearing on appellees' motion to suppress and ruled that, under the totality of the circumstances, appellees were in custody for the purposes of *Miranda* during the initial interview with Officer Carmichael and Detective Hill on March 4, 1985, and that the government had failed to show that appellees were given their proper *Miranda* rights. The district court further found that the statements subsequently given by appellees were tainted by the first interview and therefore granted appellees' motion to suppress. The government hereby appeals from that order.

## DISCUSSION

The only issue before this court is whether appellees were in custody for the purposes of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) at the time they made incriminating statements to Officer Carmichael and Detective Hill on March 4, 1985. In *Miranda* the Supreme Court delineated the rules governing the admissibility of incriminating statements provided by a criminal suspect during "custodial interrogation." *Id.,* 384 U.S. at 444, 86 S.Ct. at 1612. The Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (footnote omitted). Precisely defining "custody" for the purposes of *Miranda* has been somewhat troubling for the courts. *See Oregon v. El-*

stad, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985); *United States v. Carollo,* 507 F.2d 50, 52 (5th Cir.) *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975); [5] *Alberti v. Estelle,* 524 F.2d 1265, 1266 (5th Cir.1975), *cert. denied,* 426 U.S. 954, 96 S.Ct. 3181, 49 L.Ed.2d 1193 (1976). This circuit has previously considered the following four factors significant in resolving cases involving custody issues: (1) whether there existed probable cause for the defendant's arrest; (2) the subjective intent of the police as to whether they considered the suspect at liberty to leave the investigation site; (3) the subjective belief of the defendant regarding his freedom to leave; and (4) whether the suspect has become the focus of the investigation. *See United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir.1984); *United States v. Lueck,* 678 F.2d 895, 900 (11th Cir.), *reh'g denied,* 695 F.2d 566 (1982); *Carollo,* 507 F.2d at 52 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 105 (1975); *United States v. Montos,* 421 F.2d 215, 223 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).

■ However, the Supreme Court has recently narrowed the focus of analysis for determining whether or not an individual is in fact "in custody" pursuant to *Miranda.* The Court has stated that the ultimate inquiry, based on the circumstances of each case, is whether there is a restraint on the suspect's freedom of movement "of the degree associated with a formal arrest." *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409, *reh'g denied,* 466 U.S. 945, 104 S.Ct. 1932, 80 L.Ed.2d 477 (1984); (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)); *see Berkemer v. McCarty,* 468 U.S. 420, 441, 442, 104 S.Ct. 3138, 3151, 3152, 82 L.Ed.2d 317 (1984). The Court has also expressly adopted an objective, reasonable man standard as the appropriate test in cases involving custody issues "because, unlike a sub-

---

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of

the former Fifth Circuit handed down prior to October 1, 1981.

jective test, it 'is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question.'" *Berkemer v. McCarty*, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 3152 n. 35 (1984) (quoting *People v. P.*, 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (N.Y.1967)); *see United States v. Jonas*, 786 F.2d 1019, 1022 (11th Cir.1986). In applying the objective test, therefore, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3152 (footnote omitted). The Court in *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976), emphasized the fact that *"Miranda* implicitly defined 'focus,' for its purposes, as 'questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612). (emphasis in original). Thus, "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings ..." *Murphy*, 465 U.S. at 431, 104 S.Ct. at 3146 (1984); *see Beheler*, 463 U.S. at 1124 n. 2, 103 S.Ct. at 3519 n. 2 (1983). Under these guidelines in order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that "degree associated with a formal arrest" to such extent that he would not feel free to leave. *Murphy*, 465 U.S. at 430, 104 S.Ct. at 3145–46 (1984) (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520 (1983)); *see Berkemer*, 468 U.S. at 440–42, 104 S.Ct. at 3151–52; *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

In concluding appellees were in custody for the purposes of *Miranda*, the district court emphasized the fact that the initial interview took place at the police station, that the Montgomery police department and the Bureau were aware of the fact that appellees had engaged in an illegal firearms transaction prior to the interview, and that the police intended for appellees to implicate themselves in order to provide evidence which would ultimately lead to appellees' indictment and arrest. The district court reasoned that appellees, after having been confronted by Officer Carmichael and Detective Hill regarding the circumstances surrounding the firearms sale, and after having been asked by the officers to cooperate by giving statements, "were effectively in a position, under the totality of the circumstances, where they thought that they were in custody at the time the statements were made." On this basis the district court found "that there was a custodial effect" and that appellees were not properly given their *Miranda* rights. We respectfully disagree. We find the reasoning of the district court in the case at bar similar to the reasoning of the California Court of Appeals which was reversed by the Supreme Court in *California v. Beheler*, 463 U.S. 1121, 1123, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275. In *Beheler*, the respondent, Beheler, along with several acquaintances was involved in the killing of a drug salesman in the parking lot of a liquor store. Shortly thereafter, Beheler called the police, who arrived almost immediately. Beheler told the police that one of his companions had killed the victim and that other companions had hidden the gun in Beheler's backyard. Beheler then gave his consent to search the yard and the gun was found. Later that evening, Beheler voluntarily accompanied the police to the station house. At the station house, Beheler was specifically told he was not under arrest, and although the police did not advise Beheler of his *Miranda* rights, Beheler agreed to give an interview to the police about the murder. After the interview, which lasted less than thirty minutes, Beheler returned home. Five days later, he was arrested in connection with the murder. After waiving his *Miranda* rights, Beheler gave a second taped confession and admitted that his previous interview with the police was voluntary. The trial court found that it was not necessary for

the police to advise Beheler of his *Miranda* rights prior to the initial interview, and therefore admitted both statements into evidence.

The California Court of Appeals reversed Beheler's conviction for aiding and abetting the murder, ruling that the first interview with the police constituted custodial interrogation requiring the *Miranda* warnings. The Supreme Court noted that the Court of Appeals:

> focused on the fact that the interview took place in the station house, that before the station house interview the police had already identified Beheler as a suspect in the case because Beheler had discussed the murder with police earlier, and that the interview was designed to produce incriminating responses. Although the indicia of arrest were not present, the balancing of the other factors led the court to conclude that the State 'has not met its burden of establishing that [Beheler] was not in custody' during the first interview.

*Beheler*, 463 U.S. at 1123, 103 S.Ct. at 3519 (quoting App. to Pet. for Cert., *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275). In reversing the California Court of Appeals, The Court stated, "we have explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is a part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Beheler*, 463 U.S. at 1124, 103 S.Ct. at 3519 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714). "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'" *Id.*

■ Secondly, in the case at bar, the fact that the Montgomery police department and the Bureau had information indicating that appellees had committed a federal offense and through their investigation had intended for appellees to confirm such information through the giving of statements is immaterial to a court's determination of custody because "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time...." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3152. Another Supreme Court case, *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), provides additional insight. In *Beckwith* the petitioner-taxpayer sought to suppress statements made to Internal Revenue Agents during the course of a criminal tax investigation on the grounds that the petitioner did not receive his *Miranda* rights. The petitioner pointed out that the Intelligence Division would not receive a case until there was some indication of criminal fraud on the part of the taxpayer, thus clearly making the taxpayer the focus of the criminal investigation. Petitioner argued that a confrontation between the Internal Revenue Service and such a taxpayer placed the taxpayer under psychological restraints which are the functional and legal equivalent of custody, "especially since tax offenses rarely result in pretrial custody." *Beckwith*, 425 U.S. at 345, 96 S.Ct. at 1615. In rejecting the petitioner-taxpayer's argument, the Court stated that in resolving *Miranda's* applicability the emphasis should be on "the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted...." *Beckwith*, 425 U.S. at 346, 96 S.Ct. at 1616 (quoting *United States v. Caiello*, 420 F.2d 471, 473 (2d Cir.1969)).

Finally, the district court applied a subjective test when it emphasized the fact that appellees "thought that they were in custody at the time the statements were made." As noted, this subjective test analysis has now been explicitly rejected by

the Supreme Court. *Berkemer,* 468 U.S. at 442 n. 35, 104 S.Ct. at 3152 n. 35; *see Jonas,* 786 F.2d at 1022. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3152. (footnote omitted).

■ The record from the suppression hearing reflects that Finkelstein had "daily contact" with Officer Carmichael, who was assigned to pawn shop detail. Officer Carmichael testified that Finkelstein was free to leave the police station at any time during the interview. Finkelstein testified that, at all times during the interview, he was never placed under arrest or told that he was under arrest. Finkelstein further testified that he never requested a lawyer or to terminate the interview, but rather agreed to give a statement even though his "common sense led [him] to know it was a serious situation ..." and that "you are supposed to have a lawyer in that type situation."

Phillips testified that he drove himself to the police station in response to a message left by Officer Carmichael. When asked by Officer Carmichael to explain the firearms sale transaction, Phillips responded, "[w]hatever Luke [Finkelstein] says is what happened." It is undisputed that appellee Phillips was never placed under arrest or restrained in any way while making this brief oral statement. The record simply does not reflect that the interviews of appellees conducted by Officer Carmichael and Detective Hill operated to exert the "inherently compelling pressures which work[ed] to undermine the [appellees'] will to resist ..." *Miranda,* 384 U.S. at 467, 86 S.Ct. at 1624. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly,* —— U.S. ——, 107 S.Ct. 515, 523–25, 93 L.Ed.2d 473 (1986). In the case at bar, there is no suggestion that Officer Carmichael or Detective Hill resorted to physical or psychological pressure of

any sort in order to obtain the statements from appellees *Id.* at ——, 107 S.Ct. at 523–27.[6] After having carefully reviewed the record, we hold the district court's determination that appellees were in custody during the April 24, 1985 interview is inconsistent with the guidelines articulated by the Supreme Court and therefore erroneous. Because reasonable men in the appellees' position would not have felt a restraint on their freedom of movement that could fairly be characterized as that "degree associated with a formal arrest," we hold that appellees were not in custody for the purposes of *Miranda.* *See Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520; *Murphy,* 465 U.S. at 430, 104 S.Ct. at 3145–46; *Berkemer,* 468 U.S. at 441–42, 104 S.Ct. at 3151–52; *Jonas,* 786 F.2d at 1022.

■ The district court further suppressed the May 7, 1985, statement given to inspector Fleishman and the June 13, 1985, statement given to agents Kibler and Martz. The court ruled that since the April 24, 1985, interviews were custodial and the government failed to advise appellees of their *Miranda* rights, the subsequent statements were tainted by the fact that appellees had already made statements that were adverse. Counsel for appellees concedes that appellees were not in custody during the May 7 and June 13, 1985, interviews. Counsel relies solely on the argument that the May 7 and June 13, 1985, interviews were tainted by the illegality of the initial April 24, 1985, interview in which appellees were not advised of their *Miranda* rights. Having found that the initial April 24, 1985, interview did not require *Miranda* warnings, we need not address this argument.[7] For the foregoing reasons, the order of the district court is REVERSED.

■

**6.** *See Connecticut v. Barrett,* —— U.S. ——, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) for a recent Supreme Court decision concerning the scope of *Miranda* and reinforcing this principle.

**7.** Under the principles of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), were we to consider this issue we would find no "taint" in these subsequent statements.