[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-12730

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 12, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 05-20936-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SARA ESPERANZA MUNOZ-GUTIERREZ

Defendant-Appellant.

_____

No. 06-12773

_____

D.C. Docket No. 05-20936-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARCO SERGIO GUTIERREZ-GARCIA

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Florida

_____

**(December 12, 2007)**

Before ANDERSON and PRYOR, Circuit Judges, and VINING,  District Judge.

PER CURIAM:

These consolidated appeals follow the defendants' conditional pleas of guilty, which were entered after the district judge denied their motions to suppress certain statements made to immigration officials as they were entering this country.  Because we conclude that the district court properly denied the motions to suppress, the defendants' convictions and sentences are AFFIRMED.

On December 3, 2005, at approximately 6:30 p.m., Marco Gutierrez-Garcia ["Gutierrez"] and his wife, Sara Munoz-Gutierrez ["Munoz"], arrived at Miami International Airport on a flight from Guatemala City, Guatemala,  accompanied by two young girls, whom they presented as their daughters.  They approached the booth of Customs and Border Patrol Inspector Jacqueline Hockaday and presented four passports, four visas, and four immigration forms.  Inspector Hockaday believed that the photographs on the young girls' passports  appeared to have been substituted;

---

Honorable Robert L. Vining, Jr., United States District Judge for the Northern District of Georgia, sitting by designation.

therefore, she retained all four passports and visas and referred the four individuals to a secondary inspection before admitting them into the United States.

Prior to being questioned, both Gutierrez and Munoz were provided with an "advice of rights warnings," informing them, among other things, that they did not appear to be admissible or to have the required legal papers authorizing their admittance to the United States and that, as a consequence, they could be denied entry. They were also informed that lying or providing misinformation could subject them to criminal or civil penalties and that any statement that they made could be used against them in subsequent administrative proceedings.

At approximately 8:15 p.m., Inspector Hockaday, aided by an interpreter, began the secondary questioning of Gutierrez, inquiring into the validity of the passports and visas and the reason for their coming to the United States. During this secondary interview, Gutierrez was told that his statements had to be made freely and voluntarily, and he affirmed that his statements would be true and complete. Gutierrez was then asked about (1) his name, (2) country of citizenship, (3) current residence, (4) date and place of birth, (5) reason for traveling to the United States, (6) occupation, and (7) how much money he was carrying. Inspector Hockaday continued with more specific questions about where he had obtained his family travel documents. Gutierrez said he had applied for his and his wife's visas and passports

through his company. He stated that he had obtained his daughters' visas through a travel agency, but he could not remember exactly how much he had paid for them. When Inspector Hockaday asked whether he knew that the girls' visas he had presented were fraudulent, he said that he did not.

Inspector Hockaday then asked whether the two girls were his biological daughters, and he replied that they were. Inspector Hockaday then informed Gutierrez that the records showed that he had traveled with two girls on July 2, 2005, even though he had stated earlier in the interview that he had traveled only with his wife on that date. He admitted the two girls with whom he had traveled on July 2 were not his children and that a man named Manuel Castillo had had him bring those girls into the country in exchange for paying for his and his wife's trip. Inspector Hockaday then asked again whether the two girls with him were his biological children, and he admitted that they were not.

Inspector Hockaday then asked (1) whether the passports used for the girls traveling on July 2, 2005, were the same ones he had presented for the girls he was currently traveling with, (2) where he had obtained the passports and visas for the girls he had traveled with on July 2, 2005, (3) who had given him the two girls he had presented as his daughters, (4) whether he knew the two girls with whom he was traveling, and (5) where he was taking the girls.

4

Gutierrez answered that (1) he did not know whether the passports were the same, (2) Manuel Castillo had given him the girls and their documents, (3) he had not received any payment but that Castillo had paid for his and his wife's trip, (4) he did not know the girls, and (5) he was taking the girls to Dulles International Airport, in Washington, D.C.

Gutierrez's secondary interview lasted approximately 40 minutes. Although he had been cautioned that his statements might be used against him, at no time during the secondary interview was Gutierrez given the warnings provided for under *Miranda v. Arizona*, 384 U.S. 436 (1966).

At about the same time that Guiterrez was being questioned, Customs and Border Patrol Inspector Cherilyn Vidales, with the aid of an interpreter, began the secondary interview of Munoz. She was also given non-*Miranda* warnings and was told that any statement she made might be used against her in subsequent administrative proceedings. During this interview, Munoz did not make any statements affirmatively confirming her role in the smuggling scheme, and she did not stray from the false cover story. She stated that she was traveling with her husband and two daughters and that they were going to Maryland to celebrate one of the girls' birthday. Inspector Vidales asked if the Guatemalan passports had been legally issued, and Munoz responded that they had been and that they had received them

from her husband's employer. She also denied that any alterations had been made to the visas.

When Munoz was asked about the July 2, 2005, trip, she stated that no one had accompanied her except her husband. Unlike Inspector Hockaday, Inspector Vidales did not confront Munoz with the records indicating that two girls had accompanied them on that trip. She claimed that she had five children, three boys and the two girls accompanying them on the trip. She further denied any knowledge that the girls' passports and visas were fraudulent. At no time during this secondary interview was Munoz given any *Miranda* warnings.

Guiterrez and Munoz were kept at the airport overnight. At approximately 10:30 a.m. the next day, Customs and Border Patrol contacted Immigration and Customs Enforcement. ICE Special Agent Alejandro Diaz arrived at the airport about 30 minutes later and reviewed the inspectors' paperwork from the night before. Special Agent Diaz gave Munoz her Miranda warnings, and she agreed to waive her rights. After being questioned for about 15-20 minutes, Munoz requested a lawyer. Special Agent Diaz thereupon ended the interview. Special Agent Diaz then informed Guiterrez of his *Miranda* rights, which Guiterrez agreed to waive.

During these two interviews, Special Agent Diaz asked essentially the same questions. In response to those questions, both Munoz and Guiterrez admitted that

6

the two girls were not their daughters, that they were attempting to smuggle the girls into the United States, and that they had been paid $2000 for their efforts. They also admitted that they had made a similar smuggling trip in July 2005.

On December 16, 2005, a federal grand jury returned a three-count indictment against Munoz and Guiterrez, charging each of them with conspiracy to smuggle aliens into the country, in violation of 18 U.S.C. § 371, and two counts of smuggling aliens into the United States for profit, in violation of 18 U.S.C. § 1324(a)(2)(B)(ii). Each filed a motion to suppress the statements given at the airport, which the district judge denied. Munoz and Guiterrez subsequently entered conditional pleas of guilty and were sentenced to 36 months of imprisonment. These appeals followed.

In reviewing a district judge's denial of a motion to suppress, we review the findings of fact for clear error and the district judge's application of the law to those facts *de novo. United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004). Whether a person is "in custody" and entitled to *Miranda* warnings is a mixed question of law and fact. *United States v. Moya*, 74 F.3d 1117 (11th Cir. 1996). When considering a ruling on a motion to suppress, we construe the facts in the light most favorable to the party that prevailed in the district court, which, in this case, is the government. *United States v. Hromada*, 49 F.3d 685 (11th Cir. 1995).

7

Under *Miranda*, a person taken into custody must be advised of certain rights, including his right to remain silent and his right to counsel, prior to interrogation. "[A]liens at the border are entitled to *Miranda* warnings before custodial interrogation." *Moya*, 74 F.3d at 1119. A person is in "custodial interrogation" if "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom . . . to such extent that he would not feel free to leave." *United States v. Phillips*, 812 F.2d 1355 (11th Cir. 1987).

However, in the case of aliens, "'custodial' should be interpreted in the light of the strong government interest in controlling the borders." *Moya*, 74 F.3d at 1119. "Because of the overriding power and responsibility of the sovereign to police international borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States." *Id.* Thus, some degree of questioning and delay is to be expected at entry points into the United States. "Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the 'degree associated with formal arrest.'" *Id.* at 1120 (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 1144 (1984)).

In *Moya*, we stressed that events which might be enough to constitute "custody" away from the border would not necessarily be enough to establish "custody" in the context of entry into this country. Moreover, "referral of a person entering this country to a secondary inspector is part of the 'routine' border interrogation and does not, in and of itself, focus on the person so as to require a *Miranda* warning." *Id.* ( quoting *United States v. Henry*, 604 F.2d 908, 920 (5th Cir. 1979)).

In this case, the district judge, after hearing testimony of several witnesses, determined that the questioning never became "accusatory" but always remained "routine" as those terms have been used by our court. However, we do not have to reach the question of whether the district judge was correct with respect to the questioning of Guiterrez by Hockaday, since, as we note below, the later questioning by Diaz was proper.[1]

With respect to Munoz, we note that any failure to give *Miranda* warnings to her would, at most, be harmless error since she did not make any incriminating statements during her secondary inspection on the evening of their arrival.

The district judge, relying on *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285 (1985), refused to suppress the statements made by Guiterrez and Munoz the

---

[1] At oral argument, counsel for Guiterrez conceded that a remand was necessary only if we concluded that the statements made to both Hockaday and Diaz had to be suppressed.

9

following day, after they had been given *Miranda* warnings. Although Guiterrez and Munoz's testimony regarding the events surrounding that questioning differed from the testimony of the government officials, the district judge discredited their testimony, and we find no error in that determination. The incriminating statements made on the second day were freely and voluntarily made after Guiterrez and Munoz had been given *Miranda* warnings.

Moreover, there was no evidence whatsoever of contrived effort to undermine the effectiveness of the *Miranda* warnings by deliberately giving them only after Guiterrez had made incriminating statements. Such a tactic,[2] condemned in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601 (2004), simply did not happen in this case.

Because the district judge did not err in denying the appellants' motions to suppress with respect to statements made to Special Agent Diaz, their convictions and sentences are AFFIRMED.

---

[2] "[I]f an officer employs a strategy of deliberately questioning an in-custody suspect without any *Miranda* warnings in order to get a confession, planning to later warn the suspect and get him to repeat his confession, the post-warning confession is inadmissible unless the officer took specific curative steps to ensure that the mid-interrogation warnings achieved the purpose the *Miranda* decision intended." *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006).