**UNITED STATES of America, Plaintiff,**

v.

**Lee Robert MOORE, Defendant.**

**CASE NO. 16–60157–CR–HURLEY**

United States District Court, S.D. Florida.

Signed 01/26/2017

1330

Corey Steinberg, United States Attorney's Office, Fort Lauderdale, FL, for Plaintiff.

## ORDER GRANTING IN PART & DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS [DE 24]

Daniel T. K. Hurley, United States District Judge

**THIS CAUSE** is before the Court upon Defendant's motion to suppress physical and testimonial evidence. The Court conducted an evidentiary hearing and now makes the following:

### FINDINGS OF FACT

1. Defendant Lee Robert Moore is 38 years of age. He resides with his wife and child in Church Hill, Maryland. For the

past twelve years, he has been employed as a uniformed Secret Service officer, assigned to access control duties at the White House in Washington, D.C.

2. To prepare for his employment, Officer Moore attended a three-month training session at the Federal Law Enforcement Training Center in New Mexico. Among other subjects, he studied the requirements for making an arrest, including when and how to advise a suspect of his rights pursuant to the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He also attended a three-month specialized training for Secret Service agents at the Rowley Training Center.

3. Secret Service agents have a dual status in the District of Columbia in that, in addition to federal authority, they have the same authority as metropolitan police officers. Thus, Agent Moore was empowered to make arrests within the District, and carried a firearm, handcuffs, and a *Miranda* rights card. His normal duties involved riding a bicycle around the perimeter of the White House and admitting visitors and guests at one of the entrances.

4. Detective Kevin McKay is employed by the Delaware State Police and has had a twenty-year career in law enforcement. For the last six years he has participated in a child predator task force which aims to identify and apprehend individuals using the internet to encourage minors to engage in sexual activity. Detective McKay is a skilled interrogator who, by virtue of his experience and training, utilizes various techniques to establish rapport with subjects for the purpose of obtaining incriminating information.

5. In the course of his work, Detective McKay sometimes poses as a minor interested in meeting adults via the internet. In August of 2015, McKay began an online relationship with Officer Moore who believed he was conversing with a fourteen-year-old girl about sexual matters.

6. On Thursday, November 5, 2015, Detective McKay learned that a task force colleague had alerted the Secret Service that one of its officers was under criminal investigation. The Secret Service, in turn, contacted Detective McKay and informed him that, pursuant to the agency's administrative rules, it was obligated to suspend Officer Moore and place him on administrative leave.

7. On Friday, November 6, 2015, Inspector James Shallow of the Secret Service drove to the Moore residence in Church Hill, Maryland. Arriving at approximately 11:00 p.m., with another officer, he notified Officer Moore that his top secret clearance had been suspended and that he had been placed on administrative leave. At the conclusion of their meeting Officer Moore signed and received a copy of a form acknowledging this information. Among other things, the form stated, "The decision to suspend your Top Secret security clearance is based upon information provided to this office of your alleged inappropriate conduct." Gov. Ex. 1. Shallow informed Moore that he did not know what this was about but that Moore should contact Inspector Bond on Monday morning.

8. On Saturday, November 7, 2015, Jeffrey Pickard, an inspector with the uniform division of the Secret Service, spoke with Detective McKay and learned that McKay, concerned about officers' safety and not wanting to cause undue distress to the Moore family, desired to meet Officer Moore at a location away from his home. Inspector Pickard, therefore, telephoned Officer Moore on Sunday morning, November 8, 2015 to schedule a meeting. The tone of the conversation with friendly and supportive. Inspector Pickard, however, reminded Moore that he fell under Pick-

ard's line of command and stated that he needed to meet with him on an "official level." Pickard then designated the Maryland State Police Barracks as the meeting site. Moore asked if he should bring a lawyer with him but was told that would not be necessary; the meeting would only deal with an internal matter.

9. Evidence in the case shows that on Saturday, November 7, 2015, Officer Moore conducted internet searches about the "law regarding online sex" and "Cyber Sex—Cyber|Laws.com." He also changed the privacy settings on his Facebook account to make it less accessible to the public. Gov. Ex. 5 and 6.

10. Officer's Moore's work colleagues became aware of his suspension. This is reflected in a texting conversation that Officer Moore had with a work friend on Sunday, November 8, 2015, during which the friend advised Moore that he should "[d]rop the lawyer car[d]." Moore responded "[o]h I plan on getting one." Gov. Ex. 3.

11. On Monday, November 9th, as directed, Officer Moore drove to the Maryland State Police Barracks. He entered the lobby and was met by Detective McKay who informed him that Inspector Pickard would be right out.[1] McKay then took Moore's jacket, which contained his personal iPhone 6. When McKay realized the iPhone was password protected, he asked Moore for the password, saying otherwise it would "jail braked." Moore complied and supplied the password.

12. McKay then took Moore by the arm and led him into a small interview room where they sat facing each other, about two feet apart. The ensuing interview was video taped and is in evidence. Def. Ex. 1. From the outset, Detective McKay employed a "cop-to-cop" strategy to encourage Moore to cooperate and respond to questions. For example, McKay led off with, "You're a fellow police officer, I'm not here to screw you. ... I need to talk to you about it cop to cop and give you the benefit of the doubt." Officer Moore responded, "If this is a legal thing ... I don't want to say anything official without a lawyer." McKay said, "Hang tight, okay" and left the room to consult with other officers who were observing the interview.

13. Upon his return to the interview room, McKay began by saying, "Some things have come up that I need to speak to you about." He maintained his cop-to-cop approach and then read the *Miranda* rights. He ended by asking, "Do you understand right?" Moore said "yes," and McKay stated, "Means you can stop at any time. Having these rights in mind do you wish to speak to me today?" Moore responded, "For now."

14. McKay and Moore then engaged in a question-and-answer format that led to Detective McKay confronting Moore with photographs showing he had lied about not having a Kik account.[2] At this point the follow exchange occurred:

Moore: I would like a lawyer.

McKay: You would like a lawyer?

Moore: Yes.

McKay: Okay.

Moore: I don't want to say anything more.

---

1. Detective McKay was a member of a federal task force dealing with internet crimes against children. On the morning of November 9th, however, he had not activated his federal authority and, as a Delaware state police officer was operating outside his jurisdiction in Maryland. Nonetheless, he was conducting a custodial interrogation and had Moore attempted to leave, a Maryland police officer would have placed Moore under arrest.

2. Kik is an online forum used for messaging and communication.

McKay: All right, that's fine. Just hang tight and I'll be back in and tell you exactly what were looking at. I'm a little disappointed.

Moore: I would love to talk to you but I don't know if I am digging myself a bigger hole or helping myself out.

McKay: That's up to you, I mean you can stop at any time.

[McKay remains seated in the interview room. There follows a 16-second period of silence in which Moore appears to be considering his options.]

Moore: Am I looking at getting arrested if I want a lawyer or—

McKay: That depends on how today goes, that's up to you.

Moore: Can you give me best outcome, worst outcome of today?

McKay: It depends on our conversation quite frankly. I have what I have are the facts. I want to talk to you about why things are happening, that's why I want to talk to you, but that's your decision.

Moore: I don't know that person, [referring to one of the photographs], I've never met that person.

McKay: Do you want to talk to us a little bit further at this point?

Moore: Yeah, a bit.

McKay: You're sure?

Moore: Yeah.

15. The interrogation continued with a discussion about Moore's various electronic devices, in particular an iPhone 5 which the police believed had been one of the instruments used in the commission of the crime. Moore claimed that the iPhone 5 had been destroyed. (In fact, it was found at Moore's home during the execution of a search warrant.)

16. A search warrant was issued for the search of Moore's home on November 9, 2015. No information from the McKay–Moore interview was used in the affidavit in support of the warrant, nor has any deficiency in the warrant been established. Gov. Ex. 8.

Based on the foregoing, the Court reaches the following:

## CONCLUSIONS OF LAW

■ "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized [so that] he would not feel free to leave." *Jacobs v. Singletary*, 952 F.2d 1282, 1291 (11th Cir. 1992) (quoting *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir. 1987). The removal of Moore's jacket, the seizure of his personal iPhone, the demand for the iPhone's password and the hands-on escorting of Moore into the interview room combine to establish conclusively that Moore was "in custody" during the interrogation.

■ If Detective McKay had done what he was legally obligated to do, he would have advised Officer Moore of his *Miranda* rights at the beginning of the interview. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Rights must be read before questioning begins). Had this been done, Moore would have been disabused of the notion that, in this context, there is any such thing as an unofficial or off-the-record comment. Rather, he would have been advised "that anything said can and will be used against [him] in court." *Id.* at 469, 86 S.Ct. 1602. McKay, however, elected to take advantage of the preplanned elements of surprise and confusion. The first words out of

Moore's mouth were, "I was told this is about a work thing," to which McKay responded, "It is. We have some things going on and I need to talk to you about it cop-to-cop ...." Beginning to get the drift of where the interview was going, Moore said, "If this is a legal thing ... I don't want to say anything official without a lawyer." McKay responded, "Hang tight, ok" and left the room to consult with colleagues who were viewing the interview from a nearby location.

 *Miranda* holds "that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457; 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458, 114 S.Ct. 2350. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* at 459, 114 S.Ct. 2350. "[T]he suspect must unambiguously request counsel." *Id.* To the extent there was ambiguity in Officer's Moore's request for counsel, that deficiency is attributable to Detective McKay's failure to advise Moore of his *Miranda* rights at the beginning of the interview.

Rather than terminating the interview, however, Detective McKay left the room to consult with others. Upon returning, he immediately relaunched his cop-to-cop approach, saying:

> Some things have come up that I need to speak to you about, at least make you aware of, okay. Again, you're a police officer so I wanted to talk to you first

and give you the benefit of the doubt. You know there are two sides to every story. How long have you been a cop? [Moore responded: 12–13 years. McKay continued:]

> Okay, so you know . how this works, okay. When I speak to someone, especially someone like you, I always want to give you the benefit of the doubt, okay to two sides to every story that's why it's important to hear your version ... Now before we do that I need to read you your rights. [*Miranda* rights were read.]

The interview continued until Officer Moore stated, "I would like a lawyer. .... I don't want to say anything more." Detective McKay responded, "All right, that's fine. Just hang tight and I'll be back in and tell you exactly what we're looking at. *I'm a little disappointed.*"

 "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, *supra* at 458, 114 S.Ct. 2350. "[T]he *Edwards* [*v.* *Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) ] rule involves two separate inquiries: first, 'whether the accused actually invoked his right to counsel'; and second, 'if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.'" *Everett v. Sec'y, Fla. Dept. of Corr.*, 779 F.3d 1212, 1241 (11th Cir. 2015)(quoting *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). "[F]or a waiver to be voluntary, knowing, and intelligent, (1) 'the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice

rather than intimidation, coercion, or deception'; and (2) 'the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 420–21, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). For a court to conclude that a defendant waived his *Miranda* rights, the totality of the circumstances surrounding the interrogation must reveal both an uncoerced choice and the requisite level of comprehension. *Id.*

At the hearing on Defendant's motion to suppress, the Government contended that Detective McKay's expression of personal disappointment was, at most, an example of "subtle compulsion," much like a remark that was rejected by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Unlike *Innis*, however, which involved a conversation between two police officers in the presence of a defendant, McKay's statement was made directly to Moore. Furthermore, Detective McKay's expression of personal disappointment was a purposeful continuation of a preplanned strategy that had been utilized throughout the interview. From the very beginning, Detective McKay sought to establish rapport with Officer Moore as a fellow police officer. "You're a fellow police officer like I am. I'm not here to screw you. ... I need to talk to you about it cop to cop, okay, and give you the benefit of the doubt because again you are one of us ...." This theme continued throughout the interview. "[Y]ou're a police officer so I wanted to talk to you first and so to give you the benefit of the doubt. ..." "Look, you sound like a decent guy with an important job, okay, so I hope you are not going to screw me around, cause I am trying to not screw you around." "[I]'d like to get some honest answers first so at least I can talk about you later—I can say and go to your

defense a little bit." ... "When we get a criminal case I get in front of a prosecutor, prosecutors are going to ask is this guy an asshole or not and just because you've made a mistake doesn't mean you're an asshole .... Just because you made a mistake doesn't make you a bad guy ... You're not a bad guy, you made a mistake ...." Viewed in this context, Detective McKay's remark was not a throwaway line; it was calculated to encourage Moore to reconsider his decision to invoke his right to counsel. *Innis*, referring back to the Supreme Court's decision in *Miranda*, teaches that the use of psychological ploys like this, in a custodial setting, amounts to interrogation. Detective McKay's expression of disappointment evoked the hoped-for response and reinitiated the conversation. Consequently, it violated the Supreme Court's decisions in *Edwards v. Arizona, supra, and Davis v. United States, supra.* Bearing in mind that "the exclusionary rule is designed to deter police misconduct ...," *United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court will grant in part Defendant's motion to suppress by precluding the Government from introducing any of Officer Moore's statements from the November 9th interview in its case-in-chief.

■ Based on the Court's finding in paragraph 16 *supra*, nothing seized during the execution of the search warrant at the Defendant's home in Church Hill, Maryland subject to suppression. Gov. Ex. 8.

In accord with the general rule set forth in *United States v. Albury*, 782 F.3d 1285 (11th Cir. 2015), the Court has reviewed each of the affidavits used in support of other search warrants issued in this case, Gov. Ex. 7, 9, 10, 11 and 12, and has excised from those affidavits all information gained from Officer Moore during the

**1336**

November 9th interview, and has concluded that each of the affidavits contains sufficient untainted information which, standing alone, would have justified the issuance of a warrant. Moreover, the Court concludes that no other deficiencies have been established as to any of the warrants.

Accordingly, it is **ORDERED and ADJUDGED** that Defendant's motion to suppress is **granted in part and denied in part.** All of the statements and information gained from Officer Moore during the November 9, 2015 interview shall be inadmissible in the trial of this cause. In all other respects, Defendant's motion is denied.

**DONE and SIGNED** in Chambers at West Palm Beach, Florida this 26th day of January, 2017.