932 F.2d 1413
 John Gordon PURVIS, Petitioner-Appellant,
v.
Richard L. DUGGER, Respondent-Appellee.
 No. 89-5746.
 United States Court of Appeals,
Eleventh Circuit.
 June 10, 1991.
 
 Steven Wisotsky, Nova University Law Center, Fort Lauderdale, Fla., for petitioner-appellant.
 Joan Fowler, Asst. Atty. Gen., West Palm Beach, Fla., for respondent-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before JOHNSON and HATCHETT, Circuit Judges, and SMITH*, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this habeas corpus case arising from murder convictions in the Florida state courts, we affirm the district court's denial of relief because the appellant's confession was properly admitted into evidence.
 
 FACTS
 
 2
 On November 8, 1983, the Fort Lauderdale, Florida, Police Department discovered the dead bodies of Susan Hamwi and her infant daughter Shane. The medical examiner estimated that Susan died approximately four to five days prior to November 8th from a single stab wound to her heart. Susan's body showed signs of strangulation, and other evidence including red hairs found on her undergarments indicated that she had been raped. The medical examiner determined that Shane Hamwi died from dehydration one to two days prior to November 8th.
 
 
 3
 The Fort Lauderdale Police Department had four suspects, including the appellant, John Purvis. Purvis's only links to the crime were that he lived two to three houses away from Susan, he had been seen on occasions talking with her, and he is a redhead.
 
 
 4
 On November 9, 1983, Detectives Martin and Rice went to Purvis's home and received permission to search it. Purvis's mother, however, refused to have her room searched. At Purvis's home, the detectives found no physical evidence linking Purvis to the Hamwi deaths.
 
 
 5
 Following the search, at the detectives's request, Purvis and his mother accompanied them to the police station. While at the police station, the detectives separated Purvis from his mother by placing him in an interrogation room pending questioning. At the beginning of the interview, the detectives read Purvis his Miranda rights and took a tape-recorded statement in which Purvis consistently denied killing Susan and causing the death of Shane.
 
 
 6
 During the interrogation, the detectives learned of Purvis's history of psychiatric treatment for chronic schizophrenia, his eight to ten-year-old mentality, and his dependence on his mother. Several times, Purvis asked the detectives if he could leave the interrogation room. At one point, a detective pushed Purvis into a chair and told him that the police were going to put him in the electric chair. Purvis's mother saw the detective's action and immediately took Purvis from the police station. Purvis's mother then hired a lawyer who advised her not to speak to the police and not to allow Purvis to speak to the police without the lawyer being present.
 
 
 7
 Subsequently, Detectives Martin and Rice contacted Dr. Klass, a psychiatrist, to help with the investigation. After discussing Purvis's interrogation on November 9th with the detectives, Dr. Klass commented that the detectives could get more information from Purvis if they questioned him alone. Accordingly, the detectives sought to discover Purvis's schedule in hopes of finding him alone. Upon learning of Purvis's weekly visit to a drugstore to buy the T.V. Guide, the detectives asked the pharmacist to inform them of Purvis's next visit to the store.
 
 
 8
 On January 3, 1984, the pharmacist told Detectives Martin and Rice that Purvis would be coming into the drugstore to buy a T.V. Guide. The detectives followed Purvis to the drugstore and watched as he parked his car in front of the store at about 4:45 p.m. As Purvis left his car, the detectives told him that they wanted to clear up some unanswered questions and discrepancies regarding his November 9th statement. Purvis asked to call his mother, and Detective Martin told Purvis that he, Martin, could call her from the police station. Purvis then agreed to accompany the detectives to the police station in their car.
 
 
 9
 Upon arrival at the police station at about 5 p.m., the detectives placed Purvis in an interrogation room. Purvis once again requested to call his mother, and Detective Martin asked Purvis whether he, Martin, could make the call. Although Purvis agreed to have the detective make the call, the facts are in dispute as to whether Detective Martin attempted to call Purvis's mother before Purvis confessed.
 
 
 10
 On this second visit to the police station, Purvis waited approximately thirty minutes in the interrogation room for Dr. Klass to arrive. During this wait, Purvis made another request to call his mother, but was denied permission. Dr. Klass arrived at about 5:30 p.m., introduced himself as a psychiatrist, and proceeded to ask Purvis general orientation questions. Dr. Klass questioned Purvis for about five to ten minutes with both Detectives Rice and Ciani in the interrogation room; thereafter, sometimes one and sometimes both detectives were in the interrogation room.
 
 
 11
 During the initial questioning, Dr. Klass asked Purvis about his relationship with Susan, and Purvis responded that he liked Susan and had visited her occasionally. Later in the interrogation, Dr. Klass showed Purvis eight to ten thematic apperception cards (TAT). One of the TAT cards depicted a man with a knife standing over an individual, and another card showed a woman reclining only partially clad, with a man in the foreground fading away. Upon seeing these cards, Purvis became upset, jumped up several times yelling that he did not kill the girl, and yelling that he did not kill the baby.
 
 
 12
 After the detectives calmed Purvis down, they left him alone with Dr. Klass. About five minutes lapsed before Purvis asked Dr. Klass if the police would send him to jail or to a mental hospital. Dr. Klass testified at the pretrial hearing that upon hearing this question, he felt that Purvis was involved in Susan's murder. Minutes later, Purvis calmly held up his hand in a stabbing motion and told Dr. Klass that he killed Susan. Purvis then repeated several times that he killed Susan. Dr. Klass asked Purvis how many times he stabbed Susan, and Purvis said more than two times. Dr. Klass then asked Purvis where he stabbed her, and Purvis stated that he stabbed her in the heart. On this date, up to this point, Purvis had not been advised of his Miranda rights.
 
 
 13
 Dr. Klass asked Purvis several other questions, including the color of Susan's underwear and Purvis's feelings towards her. Purvis immediately answered that Susan wore a beige bra and white panties. Purvis went on to tell Dr. Klass that he cared about Susan; that she was not responsive; that he stabbed her in the heart; that she wore a beige bra and white underwear; that he used a lamp cord from his home to strangle her; that he brought the knife from his home; that he had told his mother of the stabbing, and that his mother told him he had done a horrible thing and not to tell anyone about it.
 
 
 14
 After Purvis incriminated himself, Dr. Klass left the room and spoke with Detectives Rice, Martin, and Ciani in order to get information only Susan's killer would have known. During this conversation, Klass asked Detectives Martin and Rice the color of Susan's underwear. Through the use of the colored photographs of the scene of the crime, the detectives told Dr. Klass the color of Susan's underwear, which matched Purvis's description. The detectives testified that from the time Dr. Klass left the room and held this conversation, Purvis was no longer free to leave the police station.
 
 
 15
 After discussing Purvis's statements with the detectives, Dr. Klass went back into the room with Detectives Rice and Ciani. Both Klass and the detectives asked Purvis questions such as "were you in love with her, did you kill her, did you strangle her with the cord, did you stab her with the knife." Purvis answered affirmatively to all these questions. In the meantime, Detective Martin contacted Purvis's mother and informed her that Purvis had confessed to killing Susan.
 
 
 16
 When Detective Martin returned to the interrogation room, Detective Rice relayed the contents of Purvis's confession. Detective Martin started to advise Purvis of his Miranda rights, and Purvis stated that he was aware of his rights. Nonetheless, the detectives gave Purvis a Miranda warning before recording his confession.PROCEDURAL HISTORY
 
 
 17
 In January, 1984, a grand jury issued a three-count indictment against Purvis alleging: (a) first-degree murder of Susan; (b) sexual battery of Susan with great force; and (c) second-degree murder of Shane Hamwi. On May 22, 1984, Purvis's lawyer filed a pretrial motion to suppress the confession arguing that Purvis was in custody during the entire interrogation and did not receive a Miranda warning before incriminating himself. The state argued that Purvis was not in custody until Dr. Klass left the room and spoke to the detectives. Therefore, according to the state, the statements made to Dr. Klass before he left the room were admissible. The Florida Circuit Court, Seventeenth Circuit, granted Purvis's motion to suppress all matters discussed after Dr. Klass left the room.
 
 
 18
 At trial, Dr. Klass testified as to the corroborating details of the oral confession including the color of Susan's underwear, Purvis's amorous feeling toward her, and Purvis's statement that he stabbed her in the heart. The jury convicted Purvis on all three counts, and the trial judge sentenced Purvis to life imprisonment without parole for twenty-five years on the first count, a concurrent twenty-year sentence for the sexual battery count, and a consecutive twenty-year sentence for the second-degree murder of Shane Hamwi. During trial, Purvis's lawyer filed a motion for mistrial arguing that Dr. Klass's statements at trial violated the pretrial suppression order. The trial court denied the motion. On appeal the Florida Fourth District Court of Appeals affirmed the trial court's decision per curiam. See Purvis v. State, 500 So.2d 1360 (Fla. 4th D.C.A. 1987).
 
 
 19
 After exhausting state remedies, Purvis filed a petition for writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. The federal district court referred the matter to a magistrate judge who found that Purvis was not in custody until Dr. Klass left the room and spoke to the detectives. Therefore, the magistrate judge concluded that Purvis's statements made before Dr. Klass left the room were properly admitted at trial. Accordingly, the magistrate judge recommended denial of Purvis's habeas corpus petition. The district court adopted this recommendation and denied relief.
 
 CONTENTIONS
 
 20
 Purvis contends that the district court erred in denying his petition for writ of habeas corpus because he was in custody at all times during Dr. Klass's interrogation and because his history of psychological treatment and his suggestive child-like behavior made him particularly susceptible to psychological coercion. Additionally, Purvis contends that Dr. Klass's trial testimony regarding the corroborative details of the murder violated the pretrial suppression order.
 
 
 21
 In response, the state contends that the district court properly denied Purvis's petition for habeas corpus relief.
 
 ISSUES ON APPEAL
 
 22
 Purvis presents three issues on appeal: (1) whether he was in custody for purposes of Miranda when he initially confessed to killing Susan Hamwi; (2) whether his Miranda rights were violated when the trial court permitted Dr. Klass to testify as to the incriminating details of the killing; and (3) whether the detectives exercised deception and psychological coercion which rendered his initial confession involuntary, thus violating the fourteenth amendment due process clause.
 
 DISCUSSION
 I. In Custody
 
 23
 Purvis contends that the district court erred in finding that he was not in custody when he initially confessed to killing Susan. Purvis argues that neither a reasonable person nor a reasonably suggestible submissive and childlike schizophrenic with an eight-year-old's understanding of waiver of rights would have perceived himself free to leave the police station or to refuse interrogation. Therefore, Purvis argues that all of his statements, including the initial confession and the subsequent corroborative details, should have been suppressed as the product of a custodial interrogation absent Miranda warnings.
 
 
 24
 In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the fifth amendment privilege against compulsory self-incrimination applied only in the context of custodial interrogation. Miranda, at 444, 86 S.Ct. at 1612. The Court defined custodial interrogation as "questioning initiated by law enforcement officials after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, at 444, 86 S.Ct. at 1612. The Court adopted an objective reasonable man standard for cases involving custodial interrogation. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
 
 
 25
 The Court later narrowed custodial interrogation to "restraint of a suspect's freedom of movement of the degree associated with a formal arrest." Minnesota v. Murphy, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). Following the Supreme Court's custodial interrogation decisions, this court held that a defendant who was never placed under arrest or restrained in any way while making oral statements at a police station was not restrained to the degree associated with a formal arrest. United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir.1987). This is the principle of law to be applied in this case.
 
 
 26
 In denying Purvis's petition for writ of habeas corpus, the district court adopted the magistrate judge's recommendation approving the state trial court's finding that Purvis was not in custody when he initially confessed to killing Susan. The district court noted the state trial court's findings that Purvis went to the police station voluntarily, was not initially placed under arrest, and was free to leave the station up to the point that Dr. Klass spoke to the detectives regarding Purvis's confession. The state trial court found and the district court concluded that the moment Dr. Klass left the room, Purvis was no longer free to leave the police station; thus, he was in custody for purposes of a Miranda warning. The district court further found that the state trial court suppressed all of Purvis's statements subsequent to Dr. Klass leaving the room in accordance with the pretrial suppression order.
 
 Presumption of Correctness
 
 27
 In a federal habeas corpus proceeding pursuant to 28 U.S.C. Sec. 2254, a state court's factual findings are entitled to a presumption of correctness. 28 U.S.C. Sec. 2254(d).[1] See also Buck v. Green, 874 F.2d 1578, 1580 (11th Cir.1987).
 
 
 28
 The state trial court was in the unique position, after observing Purvis and listening to the evidence presented at trial, to determine whether a reasonable person in Purvis's position would have felt free to leave the police station. The state trial court found that Purvis was not deprived of his freedom of action and that he had sufficient intellectual capacity to understand the circumstances surrounding his questioning.
 
 
 29
 A review of the trial transcript shows that the court's findings met the requirements of section 2254(d); thus, they are entitled to a presumption of correctness. Given the state trial court's fact finding, a reasonable person in Purvis's position would not have believed himself restrained to the degree associated with a formal arrest. See Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). As the state trial court found, Purvis voluntarily went to the police station and was never placed under arrest or restrained in any way during his initial interview with Dr. Klass. In fact, Purvis left the interrogation room at one point to get a drink of water. Purvis never requested a lawyer during the interview and never asked the doctor and the detectives to terminate the interview. Additionally, Purvis never asked to go home until after he confessed to killing Susan Hamwi. Thus, Purvis's initial interview did not exert the "inherently compelling pressures which work[ed] to undermine the [appellee's] will to resist...." United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir.1987) (quoting Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). Accordingly, Purvis's initial confession to Dr. Klass was not the product of a custodial interrogation in violation of Miranda.[2] Furthermore, after Miranda warnings, Purvis gave the detectives a recorded confession.
 
 II. Pretrial Suppression Order
 
 30
 Purvis next objects to Dr. Klass's testimony during trial regarding the corroborative details of the murder. Purvis points to two paragraphs from the pretrial suppression order which states:
 
 4.
 
 31
 After the defendant had provided these corroborated details, Dr. Klass conferred with the police detectives and reviewed photographs with the detectives to determine the truth or accuracy of the defendant's claims. After this review, Detective Rice testified that the defendant was no longer free to leave.
 
 5.
 
 32
 Up until that point this court finds that the defendant was at the police station voluntarily, that there were no restraints placed upon him and that he was not in custody for the purposes of invoking Miranda warning.[3] Purvis argues that the word "after" in paragraph four should read "before," thus the state trial court's fact finding in the motion to suppress should not be entitled to a presumption of correctness under 28 U.S.C. Sec. 2254(d).
 
 
 33
 Our review of the record shows that Dr. Klass's testimony at trial did not violate the pretrial suppression order. The state trial court was in the unique position to decide what information Dr. Klass received from Purvis while the two were alone after listening to all of the witnesses and the evidence presented. The state trial court found that Dr. Klass received some of the corroborative details regarding Susan Hamwi's murder prior to leaving the room. As Dr. Klass's testimony on direct examination shows, he testified only to these corroborative details. Thus, we will afford the state trial court's findings a presumption of correctness under section 2254(d) in finding that Dr. Klass's testimony did not violate the pretrial suppression order. The presumption of correctness which we afford the state trial court is mandated by Supreme Court and Eleventh Circuit precedent.
 
 III. Deception and Psychological Coercion
 
 34
 Purvis next contends that independent of the Miranda violations, the detecA. No, that was immediate.tives utilized deception and psychological coercion which rendered his initial confession involuntary. Purvis argues that he was denied due process of the law because his conviction rests on an involuntary confession which offended both strands of the voluntariness test enunciated in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1938).
 
 
 35
 First, Purvis argues that his confession is unreliable because the state failed to introduce any physical evidence linking him to the killings. Additionally, Purvis argues that his testimony as to the corroborative details: the color of Susan's clothing, the number of times he stabbed her, the type of cord he used to strangle her, and the death of Susan's baby, Shane, did not match the physical evidence presented at trial.
 
 
 36
 Second, Purvis argues that his confession was the product of abusive law enforcement tactics based on deception and psychological coercion. Purvis specifically notes the detectives' scheme to separate him from his mother by refusing to contact her or allowing him to contact her while he was at the police station. Purvis also notes Dr. Klass's use of the TAT cards on his "fragile mind," his extreme susceptibility to authority figures, and his eight to ten-year-old mentality.
 
 
 37
 Unlike the in custody analysis, the voluntariness of a confession is not an issue of fact entitled to a presumption of correctness under 28 U.S.C. Sec. 2254(d). Miller v. Fenton, 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985). Although the state court's findings of fact regarding voluntariness are accorded credit, the ultimate issue of voluntariness is a legal question requiring independent consideration in a federal habeas corpus proceeding. Miller, at 115. See also Williams v. Johnson, 845 F.2d 906, 909 (11th Cir.1988).
 
 
 38
 In this case, the district court conducted an independent federal review of Purvis's involuntariness claim and concluded that Purvis's confession was voluntarily made. The district court adopted the state trial court's credibility findings regarding Purvis's demeanor, his intelligence, and his responsiveness to questions at trial. The court then conducted a thorough examination of Dr. Klass's use of the TAT cards and concluded that Dr. Klass did not coerce or deceive Purvis. Additionally, the district court found no evidence of coercive police conduct. A review of the record indicates that the district court correctly found that Purvis's confession was not the result of deceptive or psychologically coercive police conduct.
 
 
 39
 Purvis vehemently argues that his history of schizophrenia, his susceptibility to authority figures, and his childlike mentality renders his confession involuntary. Purvis compares the alleged coercive tactics of the detectives in this case to the police officers in Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1959). Purvis, however, ignores the extreme police overreaching in Blackburn. In Blackburn, the defendant was insane and incompetent at the time he confessed. Moreover, the police officers exploited the defendant's weaknesses during a sustained eight to nine hour interrogation in a tiny room literally filled with police officers in the absence of the defendant's lawyer. Blackburn, at 207, 80 S.Ct. at 280.
 
 
 40
 In this case, Purvis was in an interrogation room with Dr. Klass for approximately one hour. The detectives walked in and out of the room, but for the most part and particularly when he initially confessed to killing Susan, Purvis was alone with Dr. Klass. Consequently, the circumstances surrounding Purvis's confession are not comparable to the level of coercive activities evident in Blackburn.
 
 
 41
 Purvis further relies on Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) to support his contention of psychological coercion. In Connelly, the defendant suffered from chronic schizophrenia and was in a psychotic state the day before he confessed to the murder. The Supreme Court held that the defendant's mental condition by itself was not enough to render the confession constitutionally involuntary. Connelly, at 164, 107 S.Ct. at 520.
 
 
 42
 As the district court found, the record in this case does not support Purvis's contention of deception and psychological coercion. The detectives did not deceive Purvis when they initially invited him to the police station. They specifically told Purvis that they needed to ask him some questions regarding his prior statements. Furthermore, Dr. Klass's use of the TAT cards was not psychologically coercive. Consequently, Purvis's psychological coercion claim must fail under Connelly absent police coercion.
 
 CONCLUSION
 
 43
 We hold that the district court correctly denied Purvis's petition for writ of habeas corpus. Accordingly, we affirm the district court.
 
 
 44
 AFFIRMED.
 
 JOHNSON, Circuit Judge, dissenting:
 
 45
 I dissent. I disagree with the majority's conclusion that Purvis was not in custody for Miranda purposes at the time Dr. Klass questioned him. I also believe the majority errs in not fully confronting one of the major issues in this case, i.e., whether the corroborative details Dr. Klass relayed at trial were obtained before or after the point in time at which the state court ruled Purvis to be in custody for Miranda purposes.
 
 
 46
 Though I, of course, agree with the majority's statement that the state trial court's factual findings must be afforded a presumption of correctness under section 2254(d), I believe the majority errs in assuming that the issue of custody is an issue of fact. Under the case law of this Circuit, the issue of Miranda custody is a mixed question of law and fact; whereas the trial court's factual findings are afforded deference, the application of the law to those facts must be reviewed de novo. United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir.1989) (per curiam).[1]
 
 
 47
 The starting point of my disagreement with the majority involves the question of what is an issue of fact and what is an issue of law in this case. The state court's finding that the majority believes requires the deference of the presumption of correctness under section 2254(d) is, in the majority's own words, that "Purvis voluntarily went to the police station and was never placed under arrest or restrained in any way during his initial interview with Dr. Klass." The majority presumably draws this statement from the state court's order denying Purvis's motion to suppress which reads: "Up until that point [i.e., the point at which Klass left the room and conferred with police] this Court finds that the defendant was at the police station voluntarily, that there were no restraints placed upon him and that he was not in custody for the purposes of invoking Miranda warnings." There is no doubt that the ultimate conclusions of voluntariness and custody in the state court's order are conclusions of law. See, e.g., Agee v. White, 809 F.2d 1487, 1494 (11th Cir.1987) (voluntariness); Torkington, 874 F.2d at 1445 (custody). The phrase "there were no restraints placed upon him," which the state court sandwiched in between its conclusions regarding voluntariness and custody, could be interpreted either as a conclusion of law or a finding of fact. If the phrase is only further explanation of the legal conclusion that Purvis was not in custody, then the statement does not deserve the presumption of correctness. If it is a factual finding, then it must be interpreted in the narrowest sense. Under this Court's precedent, the factual determinations that are given the presumption of correctness under section 2254 are only "historical facts in the strictest sense." Agee, 809 F.2d at 1494. If the state court's sandwiched-in phrase is interpreted in the strictest sense as a historical fact, it could mean only that Purvis was not physically restrained,i.e., he was not handcuffed or placed behind bars. To assign to the phrase any broader meaning would result in a confluence of conclusions of law and issues of fact, and would thus preclude federal review completely by affording all determinations of the state trial court the presumption of correctness.
 
 
 48
 Other than this "sandwiched-in" phrase, the state trial court made no factual findings regarding the restraint imposed upon Purvis between the time he arrived at the police station and the time he initially confessed to Dr. Klass even though extensive testimony was presented on this issue at the suppression hearing. The majority implies that the state court made a factual finding that Purvis left the interrogation room to get water, never requested a lawyer, never said he wanted to go home, and never asked to terminate the interview. But the state court made no such findings, just as the state court made no findings regarding Purvis's repeated requests to call his mother.
 
 
 49
 At the state suppression hearing, the evidence was unrefuted that the police inhibited Purvis from contacting his mother while he was at the police station. Detective Ciani stated that Purvis may have asked to be allowed to contact his mother as many as fifteen times within the short span of time it took to elicit the confession:
 
 
 50
 Q. Good enough, okay. Now, did John ask to call his mother while you were present?
 
 
 51
 A. [Detective Ciani] Yes, he did.
 
 
 52
 Q. How many times?
 
 
 53
 A. At least four, five, six, seven times, several times.
 
 
 54
 Q. Would it be more like ten or fifteen times?
 
 
 55
 A. Could be. I didn't keep count.
 
 
 56
 Q. Would it be fair to say, sir, that you'd been talking to him and he'd just stop and say could I go call my mother?
 
 
 57
 A. He would stop and ask if he could call his mother.
 
 
 58
 Q. Now, on occasions when he'd asked to call his mother you'd say or somebody would say, John, we tried to, the line's busy or something of that nature?
 
 
 59
 A. Detective Martin tried. I also tried.
 
 
 60
 Q. I said that was what you told him?
 
 
 61
 A. Yes.
 
 
 62
 Q. And he'd wait a few minutes, maybe 30 seconds and ask again; would he not?
 
 
 63
 A. Sometimes, yes, sir.
 
 
 64
 Q. Say okay, is it time now? This would be only a 30-second lapse?
 
 
 65
 A. Sometimes quicker, sometimes it took more time.
 
 
 66
 (R2:277-78).
 
 
 67
 Under the law of our Circuit, "in order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave." United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir.1987) (emphasis added) (quoting Minnesota v. Murphy, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984)). Purvis's repeated requests to call his mother are of great significance when one considers the "totality of the circumstances." Id. at 1360. The detectives had contacted Purvis at the drugstore as he was getting out of his car. They asked him to come to the station. But rather than having Purvis follow the detectives in his own car, they directed him to lock up his car and accompany them in the police car. Once at the station, Purvis would not have had any way to leave and return home or to the drugstore where his car was parked without his mother's assistance. His repeated efforts to obtain permission to telephone her can be equated with attempts to leave the police station. When such attempts are constantly thwarted, the reasonable person would come to believe that he or she was not free to leave, but was instead in custody.
 
 
 68
 In order for the "presumption of correctness" under section 2254 to apply, the state court must actually reach and decide the issue of fact. Townsend v. Sain, 372 U.S. 293, 313-14, 83 S.Ct. 745, 757-58, 9 L.Ed.2d 770 (1963); Smith v. Zant, 855 F.2d 712, 716 n. 5 (11th Cir.1988), aff'd, 887 F.2d 1407 (11th Cir.1989) (en banc). The state court in the case at bar simply made no findings as to the thwarting of Purvis's attempts to contact his mother or whether the police even made a good faith effort to locate her after telling Purvis they would call. In a situation in which "the state court has decided the merits of the claim but has made no express findings, ... the Federal District Court [is] compelled to hold a hearing." Townsend, 372 U.S. at 314, 83 S.Ct. at 757. The question of law as to whether Purvis was in custody at the time he confessed to Dr. Klass cannot be resolved, in my opinion, without factual findings regarding the thwarting of Purvis's efforts to contact his mother. I would therefore remand the case on this issue with instructions to hold an evidentiary hearing to determine the degree of restraint imposed upon Purvis from the time he arrived at the station to the moment of his initial confession.
 
 
 69
 My second point of disagreement with the majority opinion involves the issue of whether the state court erred in allowing Dr. Klass to testify as to certain corroborative details. The state trial court ruled in the pretrial suppression order that Miranda custody occurred at the moment that Dr. Klass came out of the interrogation room and conferred with the detectives, informing them that Purvis had implicated himself. Under the state court order, Dr. Klass was free to testify regarding anything which Purvis told him prior to that point.[2] It is therefore important whether Purvis related the details of the killing before or after Dr. Klass went out to confer with the detectives.
 
 
 70
 The majority correctly recognizes in part II of its opinion that the sequence of events is an issue in this case. Having acknowledged the issue, however, the majority then neglects to confront it. The majority states that Dr. Klass's testimony did not violate the suppression order as it was written. In so stating, the majority passes over the point and focuses instead upon a non-issue which no one disputes. The real issue is whether the suppression order itself is "fairly supported by the record." See Parker v. Dugger, --- U.S. ----, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991). The majority brushes up against this issue in its race toward the non-issue by its statement that "[t]he state trial court was in the unique position to decide what information Dr. Klass received from Purvis while the two were alone after listening to all of the witnesses and the evidence presented." If there were evidence in the record that the corroborative details came out while the two were alone, this statement would make sense. However, the only evidence of details emerging prior to the critical point in time concerns the color of the undergarments.
 
 
 71
 During the direct examination of Dr. Klass at the suppression hearing, there was a great deal of confusion as to the sequence of events during the confession. The direct examiner clearly tried to get Dr. Klass to focus on the question of when Purvis gave the details, but was unsuccessful. Dr. Klass testified as follows:
 
 
 72
 Q. Before the police became involved in any of the interrogation of the defendant, what information did he provide to you?
 
 
 73
 A. That he had cared about her, that she was not very responsive, that he stabbed her in the heart, the undergarment colors, that he had used a lamp cord from his home, that the knife was from his home; that he had gone to tell his mother, and she said it was horrible, but not to tell anyone.[3]
 
 
 74
 Q. From a sequential point of view, this information was provided to you prior to the police becoming involved in the interrogation; is that correct?
 
 
 75
 A. Well, they were involved in that at times they were in the room.
 
 
 76
 Q. In terms of the police being involved, specifically in the interrogation or asking questions, what I am driving at is: What information did he provide for you before the police began asking any questions?
 
 
 77
 A. Well, the reason I can't answer this specifically is that at times they would ask a question.
 
 
 78
 Q. Can you give us as much information as you can prior to the time the police became involved in the interrogation?
 
 
 79
 A. Primarily, the relationship that he had with her was apparently more intense and more of an interest on his part than I think he portrayed the woman as showing, and that he, I think, felt rebuffed at the door, that he went to go in or wanted to talk to her. He said that he wanted to talk, but she either didn't have time--but I felt that he was describing some kind of a rebuff at the door, and he said that he directly went in and stabbed her.
 
 
 80
 He related, as I mentioned, about the undergarment colors, what he had told his mother, and there may have been some other points. The two contradictory ones I recall were one was related to the knife. I believe that was after a policeman had asked, "Where did you get the knife from?"
 
 
 81
 There was also an incident about her being strangled, and a policeman had asked, "What did you strangle her with?" which I felt annoyed at, because I felt that implied that it was something other than one's hand, and I felt that it was a little bit leading.
 
 
 82
 Q. After, and again taking this in chronology now, after the defendant had provided certain of the information to you that he had stabbed her, what her undergarments looked like, that he had liked her and that she had rebuffed him, and various other things that you indicated were basically prior to the police interrogation, did you go out and tell the police what that information was? Did you advise them at this point that the defendant had made statements and this is basically what he said?
 
 
 83
 A. Well, during some of the questioning the police were there, but at one point I thought it would be helpful to know more about the specifics, to know was the person giving me information that only this person could know, was it accurate or not, and that was when the policeman showed me some photographs and indicated that the woman was partially disrobed, that there was an accurate description of the bra and panty colors.
 
 
 84
 Q. Did you relate to the defendant that the police had gotten an accurate description of the bra and panty colors?
 
 
 85
 A. I recall commenting that statistically I felt I thought that would be important that someone could identify those colors, because in my own mind if I thought of five common bra or panty colors being like black, white, beige, so forth, the chances of his getting both of those questions would be five times five or twenty-five, so one in twenty-five was a very unusual prediction.
 
 
 86
 At the same time I mentioned to them that there were contradictions, that he at several times described the knife as coming from his home and a lamp cord being involved when the police told me that there was, I believe, a telephone cord that was involved. So there were contradictions, and other times what seemed to be corroborating information.[4]
 
 
 87
 (R1:79-82).
 
 
 88
 The cross-examiner, however, was more successful in eliciting information regarding the sequence. Dr. Klass testified on cross-examination:
 
 
 89
 Q. How long would you say John had been interviewed by you and/or the detective before he finally got around to this saying, "I stabbed her."
 
 
 90
 A. It would be a guess; at 30 minutes.
 
 
 91
 Q. After that statement was made, did you go into specifics at that time?
 
 
 92
 A. There were some questions about specifics, yes.
 
 
 93
 Q. By whom?
 
 
 94
 A. By myself and the policemen.
 
 
 95
 Q. What specifics did you go into?
 
 
 96
 A. I tried to go into the specifics of his feelings at the time. His awareness of those things I thought would be more in his awareness such as the color of her underclothing and his response to what he did.
 
 
 97
 Q. Did anyone else at that time go into the other specifics?
 
 
 98
 A. Yes.
 
 
 99
 Q. Right then and there?
 
 
 100
 A. Yes.
 
 
 101
 Q. Who was that?
 
 
 102
 A. The policemen.
 
 
 103
 Q. Martin and Rice?
 
 
 104
 A. Yes.
 
 
 105
 Q. And what specifics did they go into at that time?
 
 
 106
 A. "Where did you get the knife? What did you use to strangle her with? Where did you get it from?" and questions about the child: "Did you do anything afterwards? Did you do anything with the child?" Something about a milk bottle, baby bottle.
 
 
 107
 (R1:94-95).
 
 
 108
 It is clear from this testimony that the detectives were present in the room when most of the details initially came out. Consequently, it would seem that these details were relayed after Dr. Klass had left the room and returned with the detectives, i.e., after the point in time at which Purvis was in custody for Miranda purposes according to the state court's ruling.
 
 
 109
 When Dr. Klass was later recalled to testify at the suppression hearing,[5] moreover, he related the following:
 
 
 110
 Q. The specifics that you were trying to find out was anything that might identify him as the perpetrator or not identify him as the perpetrator?
 
 
 111
 A. That's correct.
 
 
 112
 Q. And one of the things that you elicited was the question what color were her undergarments and he said she had on a beige bra and white panties?
 
 
 113
 A. Yes.
 
 
 114
 Q. It was at that time that you went out, told the police that John had said he killed Susan?
 
 
 115
 A. I don't recall the exact time, but it was not long after that point, yes.
 
 
 116
 Q. And then you looked at the photographs?
 
 
 117
 A. I believe that was the sequence, yes.
 
 
 118
 (R3:414).
 
 
 119
 Detective Rice then testified as to his recollection of the sequence of events:
 
 
 120
 Q. I just want to ask you this, sir. Taking you back to when John Purvis was being interrogated by Dr. Klass in the interrogation room--
 
 
 121
 A. Yes.
 
 
 122
 Q. You were outside?
 
 
 123
 A. That's correct.
 
 
 124
 Q. Dr. Klass came out and said John has said he killed the girl?
 
 
 125
 A. Yes.
 
 
 126
 Q. And told you that John had indicated that Susan Hamwi was wearing a beige bra and white panties?
 
 
 127
 A. I believe that's it.
 
 
 128
 Q. And that's when you looked at the photographs?
 
 
 129
 A. Yes.
 
 
 130
 Q. And then as I understand it, you and Detective Ciani and Dr. Klass went back into the interrogation room or interview room, whichever you call it, and then proceeded to question John about specifics?
 
 
 131
 A. Yes, sir.
 
 
 132
 (R3:423-24).
 
 
 133
 The supplemental testimony of Dr. Klass and the testimony of Detective Rice would seem to indicate that Dr. Klass learned only the color of the victim's undergarments prior to emerging from the room.
 
 
 134
 The state trial court, however, found in the order granting in part and denying in part the motion to suppress, that
 
 
 135
 During the interview the defendant provided various background information concerning himself and his relationship with the victim. The defendant admitted that he loved the victim but had been rebuffed by her. He admitted going to her house and killing her and provided to Dr. Klass corroborative details, which included among other things, that he had stabbed her with a knife, strangled her with a cord, and that he had gone home to tell his mother and she had advised him not to tell anyone. He described the color of her undergarments.
 
 
 136
 But based on the testimony quoted above, the only detail one could legitimately assume Purvis gave prior to the point in time at which the state court found Miranda custody occurred was the color of the undergarments. The state court's ruling that the entire series of details was conveyed to Dr. Klass prior to the critical point in time is therefore not "fairly supported by the record" as required by section 2254(d)(8). Consequently, the state court ruling is not due the deference of the presumption of correctness. Parker, 111 S.Ct. at 739.
 
 
 137
 But more importantly, at trial Dr. Klass clarified his prior equivocation as to the sequence of events. On cross-examination, he testified as follows:
 
 
 138
 Q. All right. Now, sir, do you recall going outside and talking to the police officer?
 
 
 139
 A. Yes.
 
 
 140
 Q. You talked to Rice?
 
 
 141
 A. I can't recall which ones.
 
 
 142
 Q. Martin and Rice were there; were they not?
 
 
 143
 A. Yes.
 
 
 144
 Q. They were interested in what was going on I assume?
 
 
 145
 A. Yes.
 
 
 146
 . . . . .
 
 
 147
 Q. But you did talk to either Rice or Martin?
 
 
 148
 A. Yes.
 
 
 149
 Q. You told them what John had said to some extent. You said he'd implicated himself?
 
 
 150
 A. Yes, that would be my phrase.
 
 
 151
 Q. Now, at that time you were trying to find out, were you not, something that might corroborate what he might say to you. You asked to see the photographs?
 
 
 152
 A. I don't recall if I knew there were photographs at that time, but after a brief discussion that became evident that there were and I thought there may be then some corroborating evidence whether she was actually stabbed, was she hit with a blunt object or whatever, and they'd indicated that she was stabbed and that they had photographs and I felt that the line of questioning that they were talking about when they were giving me information about it or questions that they were going to ask, whatever, did not seem to be something that if you were the perpetrator would be clearly in his mind.
 
 
 153
 I did not feel that someone in that state in committing a homicide would have a recall of what may be incidental to their interests but rather more central and when he indicated that there was perhaps some sexual contact that it would be undergarments, for instance, or aspects about her body that would be more in his awareness.
 
 
 154
 Q. That was all mentioned to you at the time that you went out and looked at the photographs; is that not true?
 
 
 155
 A. I believe that was the time, yes. I do know that was the first time I learned more about the specifics, yes.
 
 
 156
 Q. You didn't know about the sexual contact until after you went out and looked at the photographs which was after the time you had the conversation with Rice and Martin?
 
 
 157
 A. I believe that's correct, yes.
 
 
 158
 Q. They showed you photographs?
 
 
 159
 A. Yes.
 
 
 160
 Q. I think most of the photographs are in evidence which showed Mrs. Hamwi laying on the floor.
 
 
 161
 A. Yes.
 
 
 162
 Q. Partially disrobed?
 
 
 163
 A. Yes.
 
 
 164
 Q. And at that point you figured there must have been at least some sexual contact or possibly some?
 
 
 165
 A. I didn't think there would be a great deal of sexual contact from the state of her being disrobed, but there was some sexual interest, certainly, yes.
 
 
 166
 Q. That's what I meant as opposed to contact. Some sexual interest or connotation.
 
 
 167
 A. Yes.
 
 
 168
 Q. And that was the first time you knew about that; is that not true?
 
 
 169
 A. I believe so. I'm not certain, but I believe so.
 
 
 170
 Q. It's at that point then you're looking at the photographs and decide to see what can be corroborated; is that correct?
 
 
 171
 A. Yes.
 
 
 172
 Q. You go back in and you talk to John?
 
 
 173
 A. Yes.
 
 
 174
 Q. And that's when you asked him what color her bra and panties were; is that not true?
 
 
 175
 A. Yes.
 
 
 176
 Q. And he said beige or white?
 
 
 177
 A. Immediately he answered her bra was beige, her panties were white.
 
 
 178
 . . . . .
 
 
 179
 Q. When you went in and asked John, when you looked at the photographs that was after you told Rice and Martin that he said he killed her; isn't that true?
 
 
 180
 A. Yes.
 
 
 181
 Q. After that you walked back in, you proceeded to look at the photographs, you observed the color of the bra and the panties; is that not true?
 
 
 182
 A. Yes.
 
 
 183
 Q. And is it not true then that after you did that, sir, you walked back in the room and said to John what color was her bra and he said beige, what color were her panties and he said white? Isn't that the sequence of events?
 
 
 184
 A. I believe that's correct, yes.
 
 
 185
 (R7:1258-63) (emphasis added).
 
 
 186
 It is clear from this testimony that Dr. Klass did not even learn the color of the undergarments until after the critical point of custody had passed. By the time that Dr. Klass gave this testimony at trial clarifying the sequence of events, the jury had already heard many of the corroborative details. In spite of this testimony, the state trial court refused to change its suppression order and denied Purvis's motion for a mistrial.
 
 
 187
 In my view, the state trial court probably erred by admitting any of Purvis's confession to Dr. Klass. Further factual findings are necessary, however, before it can be determined if Miranda custody occurred prior to the interview with Dr. Klass as a result of the police efforts to thwart Purvis's attempts to call his mother. Even if Miranda custody occurred only when Dr. Klass emerged from the interrogation room and informed police that Purvis was implicating himself, as the state court ruled, admission of the corroborative details given after that moment violated Miranda. On this record, the only detail one could say may have been relayed prior to Dr. Klass's emerging from the room was the color of the undergarments. Dr. Klass, however, changed his mind at trial about when he learned about this detail. There can be no doubt that admission of the entire series of details violated Miranda. I would, consequently, grant the writ of habeas corpus.
 
 
 
 *
 Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Section 2254(d) states:
 In any proceeding instituted in a federal court by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit: (1) that the merits of the factual dispute are not resolved in the State court proceeding; (2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding; (5) that the applicant was an indigent and that the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) that the applicant was otherwise denied due process of law in the State court proceeding; (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record: And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.
 Purvis does not argue that his case falls within any of the eight exceptions listed in section 2254(d). Furthermore, the record amply shows that Purvis fails to meet any of the exceptions.
 
 
 [2]
 We reject the dissent's speculation that Purvis's ride to the police station in the detective's car and the request to call his mother may be equated with attempts to stop the interview and leave the station
 
 
 [3]
 Pertinent portions of Dr. Klass's testimony at trial are as follows:
 Direct examination:
 A. Not at that point. In fact, he became less guarded. At a later point he did and gave what I was later to learn was incorrect information. But at that point he seemed to be almost wanting to talk about it because I was needing to ask him less and he was like volunteering more. He would come out with something that didn't almost relate to what the previous thought was and I felt there was some statements that had an implication.
 Q. When you say 'statements that had an implication,' what type of statements are you referring to?
 A. I don't recall the exact sequence but at one point he asked if he would have to go to jail or could he go to a hospital. At another point he suddenly became totally relaxed when he said that he did kill her, that he didn't use the word stab but he used a motion with his hand like this, and so as not to--
 Q. Let me get back to that in just a second. You say he became totally relaxed when he said he did kill her. Did you have an opportunity to examine his demeanor, his facial expression and body language, if you will, at the time that he made that admission?
 A. Yes.
 Q. Was it appropriate for the admission that he made?
 A. Yes, it was.
 Q. And in what way would you describe the manner in which he made that admission to you? How did he say it?
 A. Well, at first, he was not fully appropriate when he was stating rather loudly do you think I did it, do you think I did it. And then when he did say that he killed her, he sat down and he looked downward with his eyes and appeared more relaxed as if unburdening himself and he shook his head saying, 'I killed her, I liked her,' and in essence that she would not respond to his interest and that he picked up his eyes and he said I killed her but he did not I recall say the word stab because when he made the motion, I was thinking that could still be any number of different ways, with a utensil or whatever. So I wanted to again try to get information that only a perpetrator would know.
 So I asked him what that referred to and he said, 'Well, I stabbed her.' But he made several motions indicating to me, I thought, that he would have stabbed her numerous times.
 So I asked him is that the way he stabbed her, because I thought it may also be important whether it was overhand or underhand or right or left-handed, and he used his right hand and made an overhand motion, and although he stabbed several times he said, 'Well, I stabbed her in the heart,' and I said, 'One time?' He said, 'Oh, it might have been twice,' something to that effect.
 I think he was not fully clear. But when I tried to delineate it, the result was that it was twice but like a major stab in the heart was what he seemed to be relating to because he used that phrase I stabbed her in the heart whereas many people don't know exactly where the heart is located in the chest.
 Q. After he had indicated that he had stabbed her in the heart and perhaps stabbed her another place, was there any further discussion or verification by you as to any observations that he had made about her body? Do you understand what my question is? It's kind of a blanket stated question.
 A. I think so. I know the police were interested later in specific details whereas at that time my interest was to make sure that he was not unduly stressed and to obtain information perhaps that only a perpetrator would know.
 So I did have him--I had some specifics but the specifics I thought would be those things that a perpetrator would be more interested in, such as if there was a sexual act the color of the woman's undergarments rather than what I felt might be incidental details that a person that state of mind would not have any recall about.
 Q. Let me pause here for a second. Were you aware by this time of some of the defendant's mental history?
 A. Nothing specific.
 Q. Had you been able to form an opinion yourself as to what the defendant's mental condition was?
 A. At the time I interviewed him?
 Q. Yes, sir.
 A. Yes, I did.
 Q. What was your opinion as to the defendant's mental condition?
 A. I felt he was anxious, he felt tension, he had I believe as a result of the tension he felt a psychological disorder, what we call loose associations in that his speech was not fully coherent, there was some non sequiturs, things that just didn't follow in a paragraph-like form.
 But he was aware certainly of his surroundings. He was well-oriented. He knew what the situation was so that he was not psychotic.
 Q. When you mentioned a mental disorder, were you able to make a determination at that point what type of a mental disorder he might be suffering from?
 A. Yes.
 Q. And what was your evaluation as to his mental disorder?
 A. The diagnosis would be schizophrenic reaction, chronic undifferentiated type.
 Q. Now, a person who would be suffering from that type of reaction, and based upon your knowledge of John Purvis at that time, having interviewed him and discussed with him, why would you spend time determining the color of the victim's underwear and bra as opposed to other factors surrounding the environment? Why would you pick that?
 A. Well, there were several things which the police had started to show an interest in questioning him about because at times they would be in the interviewing rooms, at times not, and the things that they would ask him I felt would not be of interest to recall for someone who may be a perpetrator of a violent and perhaps sexual act. So that I felt that it would be more fruitful to explore the areas that someone in that circumstance may have an awareness about because that was--that would be their interest at the moment such that, for instance, a robber might be more interest in the safe in the room that in the color of a drapery. So in the same way I therefore explored if he recalled the color of the woman's undergarments.
 Q. And what was the defendant's response when you asked him about the color of the victim's undergarments?
 A. He immediately said that her bra was beige and her panties were white.
 Q. Was there any hesitation at all in that description?
 Q. Did you yourself ever later have an opportunity to verify that yourself through photographs?
 A. Yes.
 Q. Was the defendant correct as to the white panties and beige bra?
 A. Yes, he was.
 Q. Did the defendant ever during this period of time mention what role, if any, his mother played in this?
 A. Yes.
 Q. What did he say?
 A. Well, I was talking to him about how he must have felt at the time and what he did. He did show a remorseful response and in responding to what he did, he said that he went home and told his mother.
 Q. Did he tell you how she responded to that?
 A. Yes.
 Q. What did he say?
 A. He said that her reply was that it was horrible but not to tell anyone.
 Q. Was there ever a discussion with you during this period of time about any type of ligature or cord?
 A. Yes, as more of the questioning continued, there was reference at one point I believe introduced by the police about cord.
 Q. I'm not interested in anything that the police introduced. The only thing I'm interest in is something that the defendant introduced.
 Did he himself initially introduce anything about a cord?
 A. I can't recall if that's something he initially introduced or if that was in response to a question by the police or myself.
 Q. How long was the conversation that you had with the defendant?
 A. I would have to guess at an hour from beginning to end, from the time I entered the room at about 5:20 till when I left although I did not check my watch. But I assumed about an hour.
 Q. Was there anything about the defendant's manner or demeanor or anything in the way he answered his questions to you that was suggestive to you that he was not being truthful when he spoke to you?
 A. There was a time later in the interview when he appeared tired and disinterested wanting to just avoid what appeared to be uncomfortable matter and then seemed to not be thoughtfully responsive to the question as if he would almost repeat what was said or would not give full attention to it.
 Q. When he first described to you the killing of Susan Hamwi, was there anything at that time in his manner or demeanor that would suggest that the defendant was not at that point telling you the truth?
 A. No.
 Q. When he described the piercing of her heart with a knife, was there anything in his manner or demeanor at that point that was suggestive that he was not telling you the truth?
 A. No.
 Q. When the defendant described the actions of his mother, was there anything in his manner or demeanor at that point that was suggestive that he was not telling you the truth?
 A. No.
 Cross examination:
 Q. All right. Now, did there come a time when you were alone with him?
 A. Yes.
 Q. When was that?
 A. It may have been a time before I showed him the cards and after.
 Q. The police were in and out during the interview?
 A. Yes, not repeatedly, but there were perhaps two or three times when they would be in the room and then out.
 Q. And you've testified, I believe, that it was during one of these periods of time that John made the statement to you am I going to jail or to a hospital?
 A. Something to that effect. Would he have to go to jail or could he go to a hospital, something to that effect.
 
 
 [1]
 The state trial court's factual findings in its order denying in part and granting in part the motion to suppress are minimal. They are: (1) the detectives contacted Purvis at the drug store and asked him to come to the station for questioning; (2) he agreed to talk to Dr. Klass who had identified himself as a psychiatrist assisting the police; (3) during the interview with Dr. Klass, Purvis confessed to the killing and related certain corroborative details; (4) Dr. Klass left Purvis in order to inform the detectives of the confession; (5) Purvis was, at that point in time, no longer free to leave by the state's own concession; (6) questioning continued without proper Miranda warnings being given; and (7) Purvis had sufficient intellectual capacity to understand and appreciate his circumstances
 
 
 [2]
 According to the portion of the order not quoted by the majority, these details included the following: "that he [Purvis] had stabbed her with a knife, strangled her with a cord, and that he had gone home to tell his mother and she had advised him not to tell anyone. ... [and] the color of her undergarments."
 
 
 [3]
 This answer, as well as others in the direct examination, would support the state court's ruling as to the sequence of events if taken out of context. The wording of this particular answer is so close to that in the state court's order denying suppression, quoted infra, that this may be the actual source of the state court's error. In every instance in Dr. Klass's direct in which he appears to say that the details came out prior to his informing the detectives that Purvis had implicated himself, however, he later contradicts or equivocates upon that assertion when the examiner tries to get him to clarify the sequence
 
 
 [4]
 In his interview with Dr. Klass and the detectives, Purvis supplied detailed answers to questions regarding a large number of the specifics of the murders. But he got almost all of the details wrong. For example, Purvis stated that Ms. Hamwi wore pink clothing or perhaps a light-colored blouse. (R1:125). In reality, she wore a dark brown pullover. (R1:147, 149). Purvis said he strangled Ms. Hamwi with a cord he took from his bedroom at home. (R1:126). Ms. Hamwi was actually strangled with the telephone cord from her kitchen. (R1:146). Purvis told the detectives he stabbed Ms. Hamwi with a knife he brought from his house. (R1:123). In truth, she was stabbed with a knife taken from her own kitchen. (R1:145-46). Purvis stated that he stabbed Ms. Hamwi three times. (R1:124). There were only two stab wounds on the body. (R1:154). Purvis claimed to have strangled and smothered the infant. (R1:127-28). In fact, the baby was not harmed by the perpetrator, but died from dehydration. (R1:151). Finally, when the detectives suggested to Purvis that he had stolen jewelry from Ms. Hamwi, Purvis stated that he stole a watch and took it home and hid it in his drawer. (R1:136-37). Though the detectives had originally thought a ring was missing, it was later found in the house; there was no jewelry missing at all. (R1:151-53)
 
 
 [5]
 The suppression hearing was held in six different segments over a period of over nine months. Dr. Klass first testified on May 22, 1984. He was recalled on March 4, 1985